223 P.3d 215

David GARNER; Patricia Smith; Andrea Christie; Allan Kliternick; Karen Souza; Jo Jennifer Goldsmith; and David Hudson, on behalf of themselves and all others similarly situated, Plaintiffs–Appellants/Cross–Appellees, (Civil No. 03–1–0305)

v.

STATE of Hawai'i, DEPARTMENT OF EDUCATION, Defendants–Appellees/Cross–Appellants, (Civil No. 05–1–0031)

and

John Does 1–5, John Doe Corporations 1–5, John Doe Partnerships 1–5, Roe Non–Profit Corporations 1–5,

and

Roe Governmental Agencies 1–5, Defendants,

and

Allan Kliternick; David Garner; Jo Jennifer Goldsmith; and David Hudson, individually and on behalf of all others similarly situated, Plaintiffs–Appellants/Cross–Appellees,

v.

Patricia Hamamoto, in her official capacity as Superintendent of Schools; Shannon Ajifu, Mary Cochran, Maggie Cox, Breene Harimoto, CEC Heftel, Lei Ahu Isa, Karen Knudsen, Denise Matsumoto, Shirley A. Robinson, Laura Thielen, Garrett Toguchi, Herbert Watanabe, and Randall Yee, in their official capacities as members of the State Of Hawai'i Board of Education; Department of Education, State of Hawai'i, Defendants–Appellees/Cross–Appellants

No. 27912.

Intermediate Court of Appeals of Hawai'i.

Oct. 30, 2009.

As Corrected Dec. 16, 2009.

Paul Alston for Plaintiffs–Appellants/Cross–Appellees (Bruce H. Wakuzawa, Peter S. Knapman, and Mei–Fei Kuo of Alston Hunt Floyd & Ing; and Eric G. Ferrer, Honolulu; and Murray T.S. Lewis, of Lewis Law Firm, on the briefs).

William J. Wynhoff, Deputy Attorney General, for Defendants–Appellees/Cross–Appellants (Dorothy Sellers, Solicitor General, on the briefs).

WATANABE, Presiding Judge, FOLEY and LEONARD, JJ.

Opinion of the Court by LEONARD, J.

This interlocutory appeal and cross-appeal stem from two consolidated class-action lawsuits brought by substitute teachers (**Plaintiffs** or **Substitute Teachers**) who claimed that they were underpaid by the State of Hawai'i Department of Education (**DOE**). In Civil No. 03–1–0305 (**Garner Action**), Plaintiffs–Appellants/Cross–Appellees David Garner, Patricia Smith, Andrea Christie, Allan Kliternick, Karen Souza, Jo Jennifer Goldsmith, and David Hudson, individually and on behalf of all others similarly situated

(**Garner Plaintiffs**), sued the DOE and other unnamed defendants (**Garner Defendants**), seeking back pay for class members for the period from 1996 through the end of the 2003–2004 school year. In Civil No. 05–1–0031 (**Kliternick Action**), Plaintiffs–Appellants/Cross–Appellees Allan Kliternick, David Garner, Jo Jennifer Goldsmith, and David Hudson (**Kliternick Plaintiffs**) sued Patricia Hamamoto, in her official capacity as Superintendent of Schools, Shannon Ajifu, Mary Cochran, Maggie Cox, Breene Harimoto, Cec Heftel, Lei Ahu Isa, Karen Knudsen, Dennis Matsumoto, Shirley A. Robinson, Laura Thielen, Garrett Toguchi, Herbert Watanabe, and Randall Yee, in their official capacities as members of the State of Hawai'i Board of Education, and the DOE (**Kliternick Defendants**), seeking back pay from the start of the 2004–2005 school year onward (collectively, the Garner Defendants and Kliternick Defendants are referred to as the **State** or **Defendants**).

In this appeal, Plaintiffs challenge the following seven interlocutory orders certified by the Circuit Court for interlocutory appeal pursuant to Hawaii Revised Statutes (**HRS**) § 641–1(b) (Supp.2005):

1. Order (1) Denying Plaintiffs' Motion for Summary Adjudication of Issues on Behalf of the Class for Class Claims as of November 8, 2000 to the Present, and for Related Injunctive Relief Filed July 13, 2004, and (2) Granting Defendant State of Hawai'i Department of Education's Motion to Dismiss Plaintiffs' Second Amended Complaint Filed January 29, 2004, filed on March 31, 2006 (**Partial Summary Judgment Order # 1**);

2. Order (1) Granting in Part and Denying in Part Plaintiffs' Motion for Partial Summary Judgment With Respect to Liability for Damages in Both Cases for the Period From November 8, 2000 to June 30, 2005, Filed November 10, 2005, and (2) Granting in Part and Denying in Part Defendants' Motion for Summary Judgment as to All Claims and Parties, Filed November 10, 2005, filed on April 6, 2006 (**Partial Summary Judgment Order # 2**);

3. Order Denying Defendants' Motion for Partial Summary Judgment as to Claims Arising Before January 7, 2003 Filed December 27, 2005, filed April 18, 2006 (**Partial Summary Judgment Order # 3**);

4. Order Denying Plaintiffs Kliternick, Garner, Goldsmith, and Hudson's Motion for Award of Pre-judgment Interest Filed April 12, 2006, filed on April 18, 2006 (**Pre-judgment Interest Order**);

5. Order Granting in Part and Denying in Part Plaintiffs' Motion for Leave to File Third Amended and Supplemented Complaint Filed October 21, 2004, filed April 18, 2006 (**Order re Third Amended Complaint**);

6. Order Denying Plaintiffs' Motion to Modify the Class and Sub–Class Definitions, Filed July 23, 2004 and June 28, 2005, filed February 13, 2006, filed on April 27, 2006 (**Order Denying Class Modification**); and

7. Order Denying Diane Kawashima's Motion to Intervene Filed February 13, 2006, filed on April 27, 2006 in the Circuit Court (**Order Denying Intervention**).

(The foregoing seven orders are collectively referred to as **Interlocutory Orders**).[1]

On May 1, 2006, the State filed a timely notice of cross-appeal from the same Interlocutory Orders.

We hold that: (1) the Circuit Court did not err in summarily ruling that HRS § 661–5 (1993) bars the Substitute Teachers' claims against the State for back pay prior to November 8, 2000; (2) the Circuit Court did not err in concluding that, pursuant to HRS § 661–1 (1993), the Substitute Teachers' claim for breach-of-contract damages is not barred by sovereign immunity; (3) HRS § 302A–624(e) (Supp.2004), as a pay-mandating statute, provided an alternative basis for invoking the court's jurisdiction under the "founded upon any statute" language in HRS § 661–1; (4) the Substitute Teachers' claim

for pre-judgment interest is barred by HRS § 661–8 (1993); (5) the Circuit Court did not abuse its discretion in denying Plaintiffs' request to modify class and sub-class definitions to include part-time employees; (6) the Circuit Court did not err in entering the Order Denying Intervention; (7) the Circuit Court did not abuse its discretion when it entered the Order re Third Amended Complaint; (8) the Circuit Court did not err in concluding that, although claims prior to November 8, 2000 were barred, Plaintiffs' claims for pay due from November 8, 2000 through June 30, 2005 were not barred by the statute of limitation because, *inter alia*, the statute of limitations applicable to these periodic pay claims began to run on each paycheck as it became due; and (9) the Circuit Court did not err when it concluded that the State violated its obligation to pay the per diem rate prescribed by HRS § 302A–624(e) during the period from November 8, 2000 to June 30, 2005.

## I. RELEVANT FACTS

### A. The 1996 Law

In 1996, the Hawai'i Legislature passed Senate Bill No. 2446, entitled "A Bill for an Act Relating to the Recodification of the Education Statutes," which was enacted into law as Act 89 upon its approval by the Governor on June 7, 1996 (**Act 89**). 1996 Haw. Sess. L. 124. Section 2 of Act 89 amended the HRS by adding a new chapter that was subsequently codified as HRS Chapter 302A. Included in the new chapter was § 724, which was renumbered by the revisor of statutes as HRS § 302A–624. *See* 1997 HRS Cum.Supp. at 135.

This lawsuit stems from the Substitute Teachers' allegation that the State did not comply with HRS § 302A–624(e), as it was enacted by the 1996 Legislature. Subsection (e) of HRS § 302A–624 established a per diem rate of pay for substitute teachers based on a "Class II teacher" classification:

(e) Effective July 1, 1996, the per diem rate for substitute teachers shall be based on the annual entry step salary rate estab-

---

1. The Honorable Karen S.S. Ahn presided over all proceedings related to the Interlocutory Or-

ders.

lished for a Class II teacher on the most current teachers' salary schedule. The per diem rate shall be derived from the annual rate in accordance with the following formula:

Per Diem Rate = Annual Salary Rate ÷ 12 months ÷ 21 Average Working Days Per Month.

HRS § 302A–624(e).

Act 89 included the following definition of a Class II teacher, which was codified as HRS § 302A–618(b)(2): "A Class II teacher is any teacher who holds a certificate issued by the department based upon four acceptable years of college education and other requirements as may be established by the department[.]" 1996 Haw. Sess. L. 141. Subsection (e) remained in effect as enacted until June 30, 2005, when it was amended by Act 70, 2005 Haw. Sess. L. 152 (**Act 70**).[2] *See* HRS § 302A–624(e) (Supp.2005). None of the issues in this appeal concern HRS § 302A–624(e) (Supp.2005) as amended by Act 70. Unless specifically stated otherwise, all further references to HRS § 302A–624(e) mean and refer to HRS § 302A–624(e) (Supp.2004).

## B. *The Substitute Teachers' Claims*

The Substitute Teachers allege that the State failed to pay them in accordance with HRS § 302A–624(e). The Garner Plaintiffs sought back pay for class members hired by the State from 1996 through the end of the 2003–2004 academic year. The Kliternick Plaintiffs sought the same remedy for people employed from and after the start of the 2004–2005 academic year.

According to the Substitute Teachers, complaints were first made to the DOE in 2001 alleging that substitute teachers were not being paid the rate provided for in HRS § 302A–624(e). When these complaints were not satisfactorily resolved, the Garner Plaintiffs filed a class action complaint on November 8, 2002. A First Amended Complaint was filed on December 2, 2002, a Second Amended Complaint was filed on January 29, 2004, and a Third Amended and Supplemented Complaint (**Third Amended Complaint**) was filed on January 6, 2005.

The Third Amended Complaint alleged that the Garner Defendants had violated HRS § 302A–624(e) by underpaying the Garner Plaintiffs as substitute teachers and sought certification of class representatives, declaratory relief, injunctive relief, and monetary damages for what they claimed was an ongoing underpayment of substitute teachers in their class. On July 23, 2004, the Circuit Court certified both a plaintiff class and a subclass pursuant to Hawai'i Rules of Civil Procedure (**HRCP**) Rule 23(a), (b)(2), and (b)(3). The class included persons hired as substitute teachers from November 8, 2000 to the "present;" the subclass included persons who had served as substitute teachers from July 1, 1996 through November 7, 2000.

On January 7, 2005, the Kliternick Plaintiffs filed a class action complaint. A First Amended Complaint (**Kliternick Amended Complaint**) was filed on January 14, 2005 and alleged that the Kliternick Defendants: (1) had violated HRS § 302A–624(e) by underpaying the Kliternick Plaintiffs as substi-

---

**2.** Act 70 amended HRS § 302A–624(e) to read as follows:

"(e) Effective [(July 1, 1996, the per diem rate or rates for substitute teachers shall be based on the annual entry step salary rate established for a Class II teacher on the most current teachers' salary schedule. The] July 1 2005, the minimum hourly or minimum per diem rate for substitute teachers shall be [(derived from the annual rate in accordance with the following formula:

(Per Diem Rate) = Annual Salary Rate ÷ 12 months ÷ 21 (Average Working Days Per Month)

determined by the legislature; provided that the department shall develop a classification and compensation schedule that is not restricted to the minimum compensation rates but

may exceed them; provided further that any individual in class I, II or III who works less than a full seven-hour work day shall be compensated on a prorated, hourly basis as follows:

(1) Class I: other individuals who do not possess a bachelor's degree shall be compensated at a rate of not less than $119.80 for a full work day;

(2) Class II: individuals with a bachelor's degree shall be compensated at a rate of not less than $130 for a full work day; and

(3) Class III department of education teachers, or licensed or highly qualified teachers, shall be compensated at a rate of not less than $140 for a full work day."

(Repealed statutory material bracketed and stricken; new statutory material underscored.)

tute teachers; (2) were breaching their contractual obligation to pay the Kliternick Plaintiffs the per diem rate prescribed by HRS § 302A–624(e); and (3) were violating HRS § 89C–2 (Supp.2008)[3] by negotiating and establishing a separate rate of pay for substitute teachers who were not members of the Hawaii State Teachers' Association (**HSTA**) and who were excluded, therefore, from collective bargaining. The Kliternick Amended Complaint sought certification of class representatives, declaratory relief, injunctive relief, and monetary damages for what they claimed was an ongoing underpayment of substitute teachers in their class. On June 28, 2005, the Circuit Court certified a plaintiff class including all persons who served as substitute teachers during the 2004–2005 school year.

### C. *Key Rulings of the Circuit Court*

The Garner and Kliternick Actions were consolidated on July 13, 2005.

In Partial Summary Judgment Order # 1, which was entered in the Garner Action, the Circuit Court denied the Garner Plaintiffs' motion for summary adjudication of the "correct" rate of pay under HRS § 302A–624(e) for the period of November 8, 2000 to the "present" and for related injunctive relief covering future payments. The Circuit Court also granted the State's motion to dismiss the Garner Plaintiffs' Second Amended Complaint on sovereign immunity and primary jurisdiction grounds, stating:

(1) The State of Hawai'i and its departments have sovereign immunity as to a direct claim for damages predicated upon Haw.Rev.Stat. § 302A–624(e), but Plaintiffs may amend their complaint to add a claim for breach of contract, which would not be barred by sovereign immunity.

(2) The State of Hawai'i and its departments have sovereign immunity as to claims arising before November 8, 2000, pursuant to Haw.Rev.Stat. § 661–5 (1993).

(3) The State of Hawai'i and its departments have sovereign immunity as to prospective injunctive relief. In order for such relief to be afforded, plaintiffs were required to, but did not, name individual officials in their official capacities and although [sic] individual defendants have not been properly identified as "Doe Defendants."

In Partial Summary Judgment Order # 2, which was applicable to both actions, the Circuit Court granted in part and denied in part both sides' motions, ruling that: (1) the passage of Act 70 rendered Plaintiffs' claim for prospective relief moot as of Act 70's effective date, July 1, 2005; (2) the Circuit Court's prior ruling that the State has sovereign immunity from direct-damages claims predicated on HRS § 302A–624(e) was extended to the Kliternick Plaintiffs; (3) all relief with respect to any underpayment occurring before November 8, 2000 was denied; (4) the State has sovereign immunity as to prejudgment interest; (5) contracts existed between the Substitute Teachers and the DOE from November 8, 2000 to June 30, 2005; and

[u]nder Section 302A–624(e), during the applicable period, the DOE was required to pay substitute teachers a per diem salary based upon the annual entry step salary rate established by the Unit 5 Collective Bargaining Agreement in effect at the applicable times for certified and/or, as of 2001, a licensed teacher based upon four acceptable years of college education and other DOE license requirements.

There was no waiver by Plaintiffs of their right to the rate of pay specified in H.R.S. § 302A–624(e) and the parties' contracts do not bar Plaintiffs' claims to the rate of pay specified in the statute. The Contracts specifically obligate the Defendants to pay the per diem compensation prescribed by H.R.S. § 302A–624(e), not some lesser amount.

Therefore Plaintiffs' Motion is granted insofar as the Court holds that the DOE violated its contractual obligation to pay the per diem rate prescribed by H.R.S. § 302A–624(e) during the period from November 8, 2000 to June 30, 2005. Defendants' motion is denied insofar as it seeks summary judgment on that contract claim.

---

**3.** HRS § 89C–2 has not changed since the Kliternick Plaintiffs filed their lawsuit.

In Partial Summary Judgment Order # 3, the Circuit Court rejected the State's argument that the contract claim asserted in the Third Amended Complaint did not relate back to the initiation of the case in November of 2002.

In the Pre-judgment Interest Order, the Circuit Court ruled that Plaintiffs' claims for pre-judgment interest on unpaid wages were barred by sovereign immunity.

The Order re Third Amended Complaint granted Plaintiffs leave to file the Third Amended Complaint to allege a breach-of-contract claim against the DOE, but denied Plaintiffs' request to amend the complaint to designate the DOE Defendants and add additional parties for the purpose of seeking injunctive relief.

Plaintiffs sought to modify the class and sub-class definitions to expand the class to include part-time employees, as well as the Substitute Teachers. In the Order Denying Class Modification, the Circuit Court denied the modification, finding that the commonality and typicality requirements for certification were not met. In addition, the Circuit Court found that the common questions of fact or law did not predominate over individual questions as between the Substitute Teachers and part-time employees. The Circuit Court also entered the Order Denying Intervention, which disallowed the intervention of Diane Kawashima (**Kawashima**), a part-time teacher.

On April 27, 2006, the Circuit Court entered a Stipulation for Leave to File Interlocutory Appeals and Order in which the Circuit Court ordered that "each of the [Interlocutory] Orders may and shall be immediately appealed pursuant to Haw.Rev.Stat. § 641–1(b) (1993)."

## II. *ISSUES ON APPEAL*

The Substitute Teachers raise the following points of error:

1. The Circuit Court erred as a matter of law when it summarily concluded that, pursuant to HRS § 661–5, the State has sovereign immunity before November 8, 2000;

2. The Circuit Court erred when it concluded that the State has sovereign immunity from a direct claim for damages predicated on HRS § 302A–624(e);

3. The Circuit Court erred when it determined that the DOE was immune from liability for pre-judgment interest under HRS § 478–2;

4. The Circuit Court erred when it denied the Substitute Teachers' request to amend the definition of the class and sub-class to include all part-time employees of the DOE whose pay was to be calculated based upon the per diem rates for substitute teachers set by HRS § 302A–624(e); and

5. The Circuit Court erred when it denied Kawashima's Motion to Intervene in the consolidated class action on behalf of part-time employees.

The State raises the following points of error on cross-appeal:

1. The Circuit Court erred when it allowed the Substitute Teachers to pursue breach-of-contract claims that were founded on an alleged violation of a statute, *i.e.*, HRS § 302A–624(e), because those claims did not meet the "founded upon contract" requirement of HRS § 661–1 and, therefore, were barred by the State's sovereign immunity;

2. The Circuit Court abused its discretion when it granted the Substitute Teachers leave to file the Third Amended Complaint in order to assert a contract claim;

3. The Circuit Court erred when it, in effect, determined that substitute teachers whose pre-November 8, 2000 claims were barred by HRS § 661–5 could nevertheless be certified as class members to bring claims stemming from services rendered on or after November 8, 2000;

4. The Circuit Court erred when it found the existence of a contract between the State and the Substitute Teachers for a per diem rate greater than the per diem rate purportedly offered to and

accepted by the Substitute Teachers; and

5. The Circuit Court erred when it found that the State violated its contractual obligation to pay the per diem rate prescribed by HRS § 302A–624(e) during the period from November 8, 2000 to June 30, 2005.

## III. *APPLICABLE STANDARDS OF REVIEW*

■■■ The State alleges that the Circuit Court lacked jurisdiction over the Plaintiffs' breach-of-contract claims based on the State's sovereign immunity.

"The applicability of the doctrine of sovereign immunity has been considered an element of subject matter jurisdiction." *Ahuna v. Dep't of Hawaiian Home Lands*, 64 Haw. 327, 333 n. 9, 640 P.2d 1161, 1165 n. 9 (1982) (citations omitted). "Whether a court possesses subject matter jurisdiction is a question of law reviewable de novo." *Hawai'i Mgmt. Alliance Ass'n v. Ins. Comm'r*, 106 Hawai'i 21, 26, 100 P.3d 952, 957 (2004) (internal quotation marks and citation omitted).

*Kaho'ohanohano v. Dep't of Human Servs., State of Hawai'i,* 117 Hawai'i 262, 281, 178 P.3d 538, 557 (2008).

■■■ "We review the circuit court's grant or denial of summary judgment de novo." *Querubin v. Thronas*, 107 Hawai'i 48, 56, 109 P.3d 689, 697 (2005) (quoting *Durette v. Aloha Plastic Recycling, Inc.*, 105 Hawai'i 490, 501, 100 P.3d 60, 71 (2004)).

Accordingly,

[o]n appeal, an order of summary judgment is reviewed under the same standard applied by the circuit courts. Summary judgment is proper where the moving party demonstrates that there are no genuine issues of material fact and it is entitled to a judgment as a matter of law. In other words, summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and the moving party is entitled to a judgment as a matter of law.

*Iddings v. Mee–Lee,* 82 Hawai'i 1, 5, 919 P.2d 263, 267 (1996); *see also* HRCP Rule 56(c).[4]

■■■ Questions of statutory interpretation are questions of law to be reviewed de novo under the right/wrong standard. *Lingle v. Hawai'i Gov't Employees Ass'n,* 107 Hawai'i 178, 183, 111 P.3d 587, 592 (2005).

Decisions related to the certification of a class are reviewed for an abuse of discretion. *Akau v. Olohana Corp.*, 65 Haw. 383, 392, 652 P.2d 1130, 1136 (1982); *Life of the Land v. Land Use Comm'n,* 63 Haw. 166, 180, 623 P.2d 431, 433 (1981); *Life of the Land v. Burns,* 59 Haw. 244, 252, 580 P.2d 405, 411 (1978).

An order denying an application for intervention is reviewable de novo under the right/wrong standard of review. *Baehr v. Miike,* 80 Hawai'i 341, 343, 910 P.2d 112, 114 (1996); *Kim v. H.V. Corp.*, 5 Haw.App. 298, 301, 688 P.2d 1158, 1160 (1984).

The Circuit Court's granting of leave to file the Third Amended Complaint is reviewed for an abuse of discretion. *Tri–S Corp. v. Western World Ins. Co.,* 110 Hawai'i 473, 490, 135 P.3d 82, 99 (2006).

## IV. *DISCUSSION*

### A. *HRS § 661–5 Bars the Recovery of Back Pay Prior to November 8, 2000*

■■ It is well-established that the State of Hawai'i's liability is limited by its sovereign immunity, except where there has been a "clear relinquishment" of immunity and the State has consented to be sued. *Chun v. Bd. of Trs. of the Employees' Ret. Sys.,* 106 Hawai'i 416, 432, 106 P.3d 339, 355 (2005). An express waiver of sovereign immunity is pro-

---

4. HRCP Rule 56(c) provides, in relevant part:
 The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. A summary judgment, interlocutory in character, may be rendered on the issue of liability alone although there is a genuine issue as to the amount of damages.

vided by HRS § 661–1 (1993).[5] This waiver is in turn expressly limited by HRS § 661–5 (1993), which unambiguously imposes a two-year limitations period and provides for a tolling of the limitation period only in the case of disability:

> § 661–5 **Limitations on action.** Every claim against the State, cognizable under this chapter, shall be forever barred unless the action is commenced within two years after the claim first accrues; provided that the claims of persons under legal disability shall not be barred if the action is commenced within one year after the disability has ceased.

■ The Substitute Teachers argue that the Circuit Court erred by failing to apply the doctrine of equitable tolling to HRS § 661–5's limitation period. Citing *Filipo v. Chang*, 62 Haw. 626, 618 P.2d 295 (1980), the Substitute Teachers argue that the State is estopped from asserting a defensive argument when it has acted contrary to the law.

■ The supreme court has held that the doctrine of equitable estoppel "is fully applicable against the government if it is necessary to invoke it to prevent manifest injustice." *State ex rel. Kobayashi v. Zimring*, 58 Haw. 106, 126, 566 P.2d 725, 737 (1977) (internal quotation marks and citation omitted). However, as the supreme court points out in *Filipo*, "significant limitations have been placed on the doctrine in this context." *Filipo*, 62 Haw. at 634 618 P.2d at 300. "[O]ne of these recognized limitations is that the doctrine of equitable estoppel may not be used in such a way as to hinder the state in the exercise of its sovereign power[.]" *Tax Appeal of Dir. of Taxation v. Med. Underwriters of Cal.*, 115 Hawai'i 180, 193, 166 P.3d 353, 366 (2007). Indeed, it is well-recognized that the application of the doctrine of equita-

ble estoppel against the government is not favored. *See, e.g., Turner v. Chandler*, 87 Hawai'i 330, 333, 955 P.2d 1062, 1065 (App. 1998).

*Filipo* appears to be rather unique in Hawai'i cases in its application of equitable estoppel against the State. The supreme court noted the fact-specific nature of its application of equitable estoppel against the State. *Filipo*, 62 Haw. at 635, 618 P.2d at 300. The facts of *Filipo* are strikingly different from those of the instant matter. In *Filipo*, the State was estopped from denying benefits to the plaintiff under a regulation that the State had followed for over twenty-three years. *Filipo*, 62 Haw. at 635, 618 P.2d at 300. Tolling of a statute of limitation was not an issue in *Filipo*.

The Substitute Teachers do not cite to any case in Hawai'i in which the two-year limitation period established by HRS § 661–5 was equitably tolled. To the contrary, when asked to apply the doctrine of equitable estoppel to extend the period of the State's waiver of its sovereign immunity, the supreme court has declined to do so. The court explained that it is "held to the bounds of the applicable statutes of limitation inasmuch as they set specific limits on the State's waiver of sovereign immunity that we must 'strictly construe' and cannot extend under these circumstances." *Office of Hawaiian Affairs v. State*, 110 Hawai'i 338, 360, 133 P.3d 767, 789 (2006) (*OHA*). As was the case in *OHA* "we are not aware of any facts in the record to indicate why the [Plaintiffs] could not have brought their ... claims within the two-year statute of limitations." *Id.*

The Substitute Teachers argue that the State "said explicitly and repeatedly (on ev-

---

5. HRS § 661–1 provides:

> § 661–1 **Jurisdiction.** The several circuit courts of the State and, except as otherwise provided by statute or rule, the several state district courts shall, subject to appeal as provided by law, have original jurisdiction to hear and determine the following matters, and, unless otherwise provided by law, shall determine all questions of fact involved without the intervention of a jury.
>
> (1) All claims against the State founded upon any statute of the State; or upon any regula-

tion of an executive department; or upon any contract, expressed or implied, with the State, and all claims which may be referred to any such court by the legislature; provided that no action shall be maintained, nor shall any process issue against the State, based on any contract or any act of any state officer which the officer is not authorized to make or do by the laws of the State, nor upon any other cause of action than as herein set forth.

ery single SF–5A [employment] form to thousands of substitute teachers for each assignment since 1996) that it was following the law." This was not, however, an "extraordinary circumstance" precluding them from bringing suit. *Id.* ("Extraordinary circumstances are circumstances that are beyond the control of the complainant and make it impossible to file a complaint within the statute of limitations.").

The material facts are undisputed. The Circuit Court correctly applied the applicable law. We conclude that the Circuit Court did not err in summarily ruling that HRS § 661–5 bars claims against the State for back pay prior to November 8, 2000. HRCP Rule 56(d).

### B. *HRS § 661–1 Waives the State's Immunity from the Substitute Teachers' Claims*

 In this case, the litigants and the Circuit Court found themselves enmeshed in paradoxical questions concerning whether the Substitute Teachers' claims to payment in accordance with a statute that allegedly set their rate of pay is a claim founded upon a statute or upon the parties' employment "contract," which provided, *inter alia*, that the "salary stated herein is subject to applicable State laws[.]" In the first instance, the State successfully argued to the Circuit Court that the Substitute Teachers could not sue the State for violating the pay statute—if the State did in fact violate the statute—because the statute, HRS § 302A–624(e), did not specifically waive the State's sovereign immunity from such suits. The State then argued both that the Substitute Teachers should not have been allowed to amend their complaint to plead an action based on contract, which issue is addressed in Section IV.F. below, and that the Substitute Teachers' contract claim is not "founded upon contract" because that contract claim is based solely on the statute, rather than on mutual assent or a meeting of the minds.

The Substitute Teachers, after being informed by the Circuit Court that they could not sue based on the statute directly, cobbled together a contract claim based in part on language in an employment form stating that the "salary stated herein is subject to applicable State laws" and· in part on the "well-recognized [principle] that law existing at the time of a contract is incorporated into that contract."

An analysis of the State's waiver of its sovereign immunity from suits for money damages necessarily starts with HRS § 661–1(1), which provides that the several circuit courts of the State shall have jurisdiction over:

> **All claims against the State founded upon any statute of the State; or upon** any regulation of an executive department; or **upon any contract, expressed or implied, with the State,** and all claims which may be referred to any such court by the legislature; provided that no action shall be maintained, nor shall any process issue against the State, based on any contract or any act of any state officer which the officer is not authorized to make or do by the laws of the State, nor upon any other cause of action than as herein set forth.

(Emphasis added.)

HRS § 661–1 is not only a jurisdictional statute; it contains a limited waiver of sovereign immunity for claims against the State of Hawai'i that are founded upon a statute—a statute that in turn provides a clear right to sue the State [6]—or founded upon a contract with the State. It does not itself create any substantive right enforceable against the State of Hawai'i for money damages. Therefore, we must consider whether a substantive right enforceable against the State exists based upon a contract with the State, as determined by the Circuit Court, or upon a statute that mandates payment of money by the State.

The State argues that Plaintiffs' claims are not "founded upon" a contract because the duties imposed by the statute existed *independently* of the contract and were not creat-

---

**6.** *See, e.g., Taylor–Rice v. State,* 105 Hawai'i 104, 109–10, 94 P.3d 659, 665–66 (2004) (holding that the State is immune from money damages, ex- cept where there has been a "clear relinquishment" of sovereign immunity and the State has consented to be sued).

ed by the contractual relationship. Both parties cite to federal Tucker Act[7] cases for guidance as to whether a claim is contractually based. Perhaps not surprisingly, they read these cases with different emphases. The State quotes *North Star Alaska v. United States,* 14 F.3d 36, 37 (9th Cir.1994), for the legal principle that a claim is founded upon a contract only if the claim is "concerned solely with rights created within the contractual relationship and has nothing to do with duties arising independently of the contract. . . ." The Plaintiffs rely, however, on the fact that the *North Star* court rejected the argument of North Star that its claim for reformation sought to enforce constitutional and statutory obligations and instead held that North Star's reformation claim was necessarily based on the parties' contract. *See id.* The *North Star* court held that North Star's claim was founded upon a contract with the United States and therefore was within the Tucker Act, subject to the Tucker Act's restriction on relief (which did not include reformation) and, accordingly, not within the district court's jurisdiction. *Id.* at 37–38.

With regard to *Megapulse, Inc. v. Lewis,* 672 F.2d 959 (D.C.Cir.1982), the State argues that the Circuit Court of Appeals for the District of Columbia rejected the idea that any case requiring some reference to or incorporation of a contract is necessarily on the contract and therefore directly within the Tucker Act. While this is true (*see* 672 F.2d at 967–68), as Plaintiffs suggest, the D.C. Circuit Court concluded that Megapulse's claims against the government were based strictly on an alleged governmental infringe-

ment of property rights and violation of the Trade Secrets Act, not on any breach of contract. 672 F.2d at 969. It was the government, in conjunction with its defense against these claims, that attempted to show that it came into possession of the property through a contract. *Id.* Under these circumstances, the D.C. Circuit Court rejected the government's argument and held that the mere existence of contract-related issues did not convert the action to one based on the contract. *Id.*[8]

While HRS § 661–1 is quite similar to and historically rooted in the Tucker Act, the federal court cases debated by the parties manifest tensions between federal claims court jurisdiction versus federal district court jurisdiction and claims seeking contract damages versus claims seeking equitable relief, which are not at issue in the Substitute Teachers' claims. Of import to the instant dispute, the gravamen of the cited Tucker Act cases is that an action is "founded upon a contract" if the claimant's claim is genuinely and rationally based upon the parties' contractual relationship with each other, alleges that the defending party breached a duty owed to the claimant under an express or implied agreement between the parties, and requests money damages for the breach. *See, e.g., Megapulse,* 672 F.2d at 968–69.

The Substitute Teachers were unquestionably in a contractual relationship with the State. The Substitute Teachers seek money that they claim is due to them for the work performed for the State under the contractual agreements between them. The Substitute Teachers further allege that, under the

---

7. The Tucker Act, which waives sovereign immunity and provides for Unites States claims court jurisdiction over certain claims against the United States, states in relevant part:

> (a)(1) The United States Court of Federal Claims shall have jurisdiction to render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort.

28 U.S.C. § 1491(a)(1). Under the "Little Tucker Act," 28 U.S.C. § 1346(a)(2), the United States district courts have concurrent jurisdiction with

the claims court for actions not exceeding $10,000.

8. The parties also cite, with differing interpretations, *Transohio Sav. Bank v. Dir., Office of Thrift Supervision,* 967 F.2d 598 (D.C.Cir.1993). The holding in *Transohio* is, however, that the U.S. Court of Claims has jurisdiction over contract-based claims for money damages under the Tucker Act, the U.S. district court does not have jurisdiction over contractual claims seeking equitable relief, but the U.S. district court is not barred from hearing statutory and due process claims seeking equitable relief pursuant to the Administrative Procedure Act, 5 U.S.C.A. § 702, even when those claims involve contracts. *Id.* at 607–11.

express and implied terms of their agreement with the State, they are entitled to pay in accordance with a pay-mandating statute, HRS § 302A–624(e). The State does not deny the contractual relationship. The State does not deny that the Substitute Teachers seek additional pay for the services provided pursuant to the contracts between them. The State denies that the contract required the State to pay the Substitute Teachers in accordance with the statute. However, the State's denial that this particular pay scheme was mandated by the contractual agreements between the parties is a defense to the allegations and does not extinguish the nature of the Substitute Teachers' claim, which is that the State—under the parties' agreements—was required to pay the teachers in accordance with the statute.

For these reasons, we conclude that the Circuit Court did not err when it allowed the Substitute Teachers to pursue breach-of-contract claims against the State in this case.

■■■■ We also conclude, on an alternative ground, that the State's sovereign immunity from Plaintiffs' claims is waived pursuant to HRS §§ 661–1 and 302A–624(e). As noted above, HRS § 661–1 waives the State's sovereign immunity with respect to claims against the State "founded upon any statute[.]" The Hawai'i Supreme Court has, however, made it clear that this waiver does not extend to every claim that might be predicated upon any law. It applies only when the underlying law clearly and unequivocally mandates a waiver. See Taylor–Rice v. State, 105 Hawai'i 104, 109–10, 94 P.3d 659, 665–66 (2004); Kalima v. State, 111 Hawai'i 84, 108–09, 137 P.3d 990, 1014–15 (2006).

In Kalima, the supreme court looked to federal case law analyzing the Tucker Act for guidance in analyzing HRS § 661–1. Id. Federal courts have consistently recognized jurisdiction as properly "founded upon a statute" such as the Fair Labor Standard Act pursuant to the Tucker Act, holding that

plaintiffs can perfect jurisdiction under statutes that are "money mandating." See, e.g., Ewer v. United States, 63 Fed.Cl. 396, 398–99 (2005)(citing United States v. Mitchell, 463 U.S. 206, 103 S.Ct. 2961, 77 L.Ed.2d 580 (1983)); Eastport S.S. Corp. v. United States, 178 Ct.Cl. 599, 372 F.2d 1002, 1008 (1967); Hickman v. United States, 43 Fed.Cl. 424, 425 (1999). In Kalima, the supreme court recognized the money-mandating analysis of the federal court:

> the Tucker Act does not create any substantive rights enforceable against the United States for money damages.... The claim must be one for money damages against the United States and **the claimant must demonstrate that the source of substantive law he relies upon can fairly be interpreted as mandating compensation by the Federal Government for the damages sustained.**

111 Hawai'i at 108, 137 P.3d at 1014 (emphasis in original) (citations omitted).

Federal law is clear that statutory language such as "will pay" and "shall pay" creates the necessary money mandate to allow a suit for damages under the Tucker Act. See, e.g., Britell v. United States, 372 F.3d 1370, 1378 (Fed.Cir.2004). Barring such suits would improperly allow an agency or department to violate the legislative mandate and frustrate the legislative purpose. Accord Jacober v. Sunn, 6 Haw.App. 160, 170–71, 715 P.2d 813, 821 (1986). HRS § 302A–624(e) stated that the per diem salary for substitute teachers "shall be" based on the formula it describes. Thus, we conclude that HRS § 302A–624(e), as a pay-mandating statute, provided an alternative basis for invoking the court's jurisdiction under the "founded upon any statute" language in HRS § 661–1.[9]

### C. Plaintiffs Are Not Entitled to Pre-Judgment Interest

■■■ The State has not waived its sovereign immunity from an award of pre-judg-

9. We reject the State's argument that Pele Defense Fund v. Paty, 73 Haw. 578, 837 P.2d 1247 (1992), is applicable to this case. Pele Defense Fund did not address the scope of the immunity waiver found in HRS § 661–1, rather it concerned whether the plaintiffs were entitled to injunctive and declaratory relief against the State. Id. at 608–11, 837 P.2d at 1265–66. We also reject the State's argument based on HRS § 388–1 (1993). While HRS § 388–1 excludes the State from its definition of "employer," that exclusion merely bars relief against the State from liability under Chapter 388.

ment interest in this case. HRS § 661–8 (1993) provides:

> § 661–8 **Interest.** No interest shall be allowed on any claim [against the State] up to the time of the rendition of judgment thereon by the court, unless upon a contract expressly stipulating for the payment of interest, or upon a refund of a payment into the "litigated claims fund" as provided by law.

HRS § 661–8 disallows pre-judgment interest on claims against the State, except in certain, identified instances. We reject Plaintiffs' argument that HRS § 478–2 and *Fought & Co., Inc. v. Steel Eng'g and Erection, Inc.,* 87 Hawai'i 37, 951 P.2d 487 (1998), support an award of pre-judgment interest against the State in this case. HRS § 478–2, entitled "Legal rate; computation," sets the legal *rate* of interest to be allowed with respect to obligations of the State. It does not, however, contradict or supersede the limitation of the State's obligation to pay pre-judgment interest only upon a "contract expressly stipulating for the payment of interest." HRS § 661–8. *Fought* presented a somewhat unique—and completely inapplicable—situation in which the State was found to be liable for another party's liability to a third party, which liability included the payment of pre-judgment interest to the third party at the statutory rate set forth in HRS § 478–2. *Fought,* 87 Hawai'i at 42, 951 P.2d at 492. The Substitute Teachers cite no other authority supporting their position. *Cf. Taylor–Rice,* 105 Hawai'i at 111, 94 P.3d at 666 (plain reservation of immunity with respect to pre-judgment interest on tort judgments against the State is conclusive absent another statute that unequivocally expresses a clear relinquishment of immunity from awards of pre-judgment interest); *Chun,* 106 Hawai'i at 433, 106 P.3d at 356 (contrasting express, but limited, waivers of immunity from pre- and post-judgment interest, with statutes of general application). For these reasons, we conclude that the Circuit Court did not err when it denied Plaintiffs' request for pre-judgment interest.

### D. *The Requested Class Modifications*

Plaintiffs argue that the Circuit Court abused its discretion in denying their request to modify class and sub-class definitions to include part-time employees. The Plaintiffs acknowledge that the Circuit Court correctly articulated the moving parties' burden under HRCP Rule 23, as follows:

> Thus Plaintiffs must show all of the following:
>
> 1) the class is so numerous that joinder of all members is impracticable;
>
> 2) There exists questions of law or fact common to the class;
>
> 3) The claims or defense of the representative parties are typical of those of the class;
>
> 4) The representative parties fairly and adequately will protect the interest of the class; and
>
> 5) Questions of law or fact common to the class predominate over questions affecting individual members, and a class action is superior over available methods for the fair and efficient adjudication of the controversy. The absence of one factor may defeat certification.

*See* HRCP Rule 23(a) and (b)(3); *see also Life of the Land v. Land Use Comm'n,* 63 Haw. 166, 623 P.2d 431 (1981); *Life of the Land v. Burns,* 59 Haw. 244, 580 P.2d 405 (1978). The abuse of discretion alleged stems, in the first instance, from the Circuit Court's finding that the commonality, typicality, and adequacy of representation requirements of HRCP Rule 23(a)(1) were not met. The Circuit Court assumed that, for the purpose of their motion, the Substitute Teachers had met the requirement of numerosity.

Regarding commonality, the Circuit Court recognized that a review of the meaning of HRS § 302A–624(e) was necessary to the claims of part-time employees, as well as the Substitute Teachers, but did not find "a common course of conduct over the entire period directed against all" plaintiffs. The basis for the Circuit Court's negative view of commonality can be better understood in conjunction with the court's review of the typicality requirement, as set forth in the Order Denying Modification:

> As to the required typicality, the claims or defenses of the representative plaintiffs

must be typical of those of the class in general. *Life of the Land [v. Land Use Comm'n], supra,* defines this to require findings that the plaintiffs' claims are essentially similar to those of all class members and that there exists no conflict of interest between the representative and the class. We must look at the nature of the claims or defenses, not at the facts from which they arise or the relief sought. *Hanon v. Data Products Corp.,* 976 F.2d 497 (9th Cir.1992). *Hanon* also says, however, that, while the trial court cannot judge the merits of the case, it may consider the evidence in its review of Rule 23 requirements. The court may consider all material before it and the nature and range of proof necessary to establish the complaint's claims; determine as best as possible the future course of litigation; and then determine whether Rule 23's requirements are met at this juncture. *Blackie [v. Barrack,* 524 F.2d 891 (9th Cir.1975) ], *supra,* at 901. The test of typicality is whether other members have the same or similar injury, whether the action is based on conduct which is not unique to named plaintiffs, and whether other class members have been injured by the same course of conduct. *Hanon, supra,* at 508. Based upon the record, the court finds that the part-time employees used different forms and, apparently, occasionally fewer or no relevant forms at all. Plaintiffs allege that pay for part-time employees is determined by a school code, apparently enacted administratively, which in turn until 2001 referred to the pay for class I, class II, and class III teachers. Until recently, section 302A–624(e) required that substitute teachers be paid at the entry level for class II teachers. Therefore, the bases for finding the existence of a contract, or lack thereof, is factually markedly different as between substitute teachers and part-time employees. Similarly, the determination of what material terms may have been part of any alleged contract between the Department of Education and part-time employees may depend upon very different considerations from those at play with regard to substitute teachers. It follows, then, that the claims of the current class representatives for substitute teachers are not typical of those of the proposed class of part-time employees.

Plaintiffs urge this court to adopt the view that "only a single issue common to all members of the Class" is necessary to establish commonality. It appears, however, that the Hawai'i Supreme Court would allow the Circuit Court wider latitude in its consideration of this issue:

> While there are overtones of due procedure in the commonality test, in our opinion the inquiries generated thereby are more directly concerned with the establishment of predictable economies of time, effort, and expense and uniformity of decision.

*Life of the Land v. Land Use Comm'n,* 63 Haw. at 183, 623 P.2d at 444–45.

The supreme court has informed us that the Circuit Court's "broad discretion in deciding whether to certify a class" is normally undisturbed on review, unless the record discloses a possible "misapprehension or misapplication" of Rule 23's criteria. *Id.* at 180, 623 P.2d at 443 (internal quotation marks and citations omitted). The supreme court favorably recounted the following distinction:

> The trial court must apply the Rule's criteria to the facts of the case in determining whether the suit brought as a class action is to be so maintained, and if it fails to do this its determination is reviewable; but where it does apply the criteria to the facts of the case it has broad discretion as to whether the suit may be maintained as a class action, which the appellate court should normally respect.

*Id.* at 180 n. 16, 623 P.2d at 443 n. 16 (citation omitted).

In *Life of the Land,* the supreme court also described the subparts of Rule 23(a) as "four overlapping analytical steps which focus upon sequential sets of concrete facts, relationships and requirements." *Id.* at 182, 623 P.2d at 444 (internal quotation marks and citation omitted). The court viewed the typicality requirement to have an affinity to the fair and adequate representation require-

ment, which requirements, together, focus on the absence of a conflict of interest between the members of the class, in this case the members of the proposed expanded class. *See id.* at 182–84, 623 P.2d at 444–46. The supreme court explained what it meant by a conflict of interest in the context of class certification:

> Where colorable [claims or] defenses may derive from particular circumstances, rather than from those common to the putative [plaintiff or] defendant class, a class certification is improper. And where there is indication that the representative may be particularly interested in a claim or defense unique to him or a subclass, the court is justified in denying class action certification on the grounds of inadequate representation.

*Id.* at 184, 623 P.2d at 445 (internal quotation marks, brackets, and citation marks omitted).

Regarding these latter two requirements, in addition to the discussion of typicality set forth above, the Circuit Court stated:

> As to the fourth requirement of adequacy of representation, *Life of the Land, supra,* says that, where claims are coextensive and without conflict, there is a probability of fair and adequate representation. Under those circumstances, the representatives would be likely to prosecute the cases of class members as they would litigate their own. For the reasons discussed as to the typicality requirement, the court finds that this element also is not met on this record. It is difficult to envision how current class representatives would be likely to prosecute the cases of class members as they would litigate their own. For the reasons discussed as to the typicality requirement, the court finds that this element also is not met on this record. It is difficult to envision how current class representatives for substitute teachers adequately and fairly can litigate the claims of the various groups of part-time employees.

▮ Based upon our review of the entire record in this case, as well as the Order Denying Modification, we conclude that the

Circuit Court analyzed the substantive allegations and the other materials before the court, considered the nature and range of proof necessary to establish the allegations of the existing class (and subclass), as well as the proposed modified class, and considered the likely future course of the litigation, within the criteria of HRCP Rule 23(a).[10] That is all that is required in conjunction with the exercise of the court's discretion. *See, e.g., Blackie v. Barrack,* 524 F.2d 891, 900–01 (9th Cir.1975) (district court satisfied requirements of Fed.R.Civ.P. 23(a) and (b)(3) when it analyzed the allegations of the complaint and other materials presented, considered the nature and range of proof necessary to establish those allegations, determined the likely future course of the litigation, and then determined that the requirements were met). We conclude that the Circuit Court did not abuse its discretion in rejecting Plaintiffs' motion to modify the class and sub-class definitions.

### E. The Order Denying Intervention

In *Ing v. Acceptance Ins. Co.,* 76 Hawai'i 266, 271, 874 P.2d 1091, 1096 (1994), the Hawai'i Supreme Court adopted the standard set forth in *Kim v. H.V. Corp.,* 5 Haw.App. 298, 301, 688 P.2d 1158, 1160 (1984), for an application of intervention of right pursuant to HRCP Rule 24(a)(2):

> Rule 24(a)(2), HRCP, requires [the court] to consider four factors in assessing [the applicants'] right to intervene: a) whether the application was timely; b) whether [the applicants] claimed an interest relating to the property or transaction which [was] the subject of the action; c) whether the disposition of the action would, as a practical matter, impair or impede the [applicants'] ability to protect that interest; and d) whether [the applicants' interest was] inadequately represented by the existing defendants.

*Kim,* 5 Haw.App. at 301, 688 P.2d at 1161.

▮ In this case, the Circuit Court relied on *Ing* and *Kim* in its Order Denying Inter-

---

10. We need not reach the Substitute Teachers' challenge to the Circuit Court's finding that the common questions of fact or law do not predomi-

nate over individual questions as between the Substitute Teachers and part-time employees, as required under HRCP Rule 23(b)(3).

vention. Because the requirements of intervention are stated in the conjunctive, it was necessary for Kawashima to meet all of them to intervene as a matter of right under HRCP Rule 24(a)(2). *See Baehr,* 80 Hawai'i at 344, 910 P.2d at 115. The Circuit Court concluded that Kawashima did not meet the first and third requirements.

We first examine the question of timeliness. Although the Circuit Court's order denying an application for intervention by right is reviewable de novo, "the question of timeliness ... is a matter left to the sound discretion of the trial court." *Ing,* 76 Hawai'i at 271, 874 P.2d at 1096 (citation omitted); *Kim,* 5 Haw.App. at 301, 688 P.2d at 1161. We must consider "the totality of circumstances, including the lapse of time between when the proposed intervenor should have sought intervention and when it actually did and prejudice caused to existing parties by the lapse of time." *See Ing,* 76 Hawai'i at 271, 874 P.2d at 1096 (citing *Kim*); *Kim,* 5 Haw.App. at 301–02, 688 P.2d at 1161. The Circuit Court included its analysis of these considerations in the Order Denying Intervention:

> As to the first factor, the relevant date is when Ms. Kawashima, who seeks to intervene for part-time teachers and/or employees, reasonably should have known of her interest in this action. *Ing, supra* at 272[, 874 P.2d 1091]. The substitute teachers' complaint was transferred to the [Circuit Court] in early 2003. One of the central issues of that case has always been the meaning of the section 302A–624(e), Hawaii Revised Statutes, which establishes substitute teachers' pay. The court issued a variety of rulings during 2004, including one regarding the parameters of the State's sovereign immunity as to the complaint's claim for violation of State statute, and one in late 2005 regarding the viability of substitute teachers' contract claim[s] and the meaning of section 302A–624(e). Newspaper articles have tracked these substantive decisions, and, in the past, Mr. Alston and the substitutes have figured in

press coverage relating to the claims in the substitute teachers' case. Ms. Kawashima has been a part-time teacher since 2001, and the rules purporting to set part-time teachers' pay apparently last were revised in 1990. The court finds Ms. Kawashima reasonably should have known of her interest in this case, at the very least, months ago. In terms of the potential prejudice to existing parties should the court allow Ms. Kawashima's intervention, the court finds that the intervention would inject a panoply of new issues into this case, assuming the applicability of the provisions of the school code (5000 series). The number of new issues would be increased if Ms. Kawashima sought to represent other part-time DOE employees as well. Further, at this point, the court already has ruled on most definitive issues in this case, including the meaning of the statute defining substitute teachers' pay, and it is untimely for Ms. Kawashima to ask to have a say about such matters. This would cause, at the least, added expense and delay to existing parties, whose rights have already been determined at this level and the final adjudication of which would be delayed while the claims of Ms. Kawashima and her purported class are litigated.

Plaintiffs[11] challenge the Circuit Court's analysis on three grounds. First, they state that Kawashima only became aware that her hourly rate was required to be based on the per diem rate for substitute teachers in the fall of 2005 and only became aware of the Circuit Court's ruling that the Substitute Teachers had been underpaid in December of 2005. Thus, based on a 1942 case from another jurisdiction, Plaintiffs urge us to find Kawashima's claim to be timely. Plaintiffs ignore, however, the supreme court's directive in *Ing* that the relevant date is not when the proposed intervenor had actual knowledge of its interests in the action; rather, the relevant date is when the proposed intervenor "knew or *reasonably should have known* of its interest" in the

---

11. Although not raised by the State in its Answering Brief, we note that Kawashima did not file a notice of appeal from the Order Denying Intervention (Kawashima is not listed as an appealing party in the notice of appeal) and, although she is represented by the same counsel as Plaintiffs, none of the briefs filed in this appeal purport to be filed on her behalf.

action. *Ing,* 76 Hawai'i at 272, 874 P.2d at 1097 (emphasis in original) (citations omitted). Second, Plaintiffs argue that the Circuit Court wrongly ruled that the intervention would inject numerous new issues into the case. Lastly, Plaintiffs assert that the Circuit Court's decision must be reversed because, by limiting Kawashima's recourse to the other lawsuit she filed, Kawashima's recovery will be reduced by nearly three and one-half years of pay differential.

We reject Plaintiffs' contentions. The Circuit Court properly considered when Kawashima should have known of her interest in the action, as provided in *Ing.* Neither the court's determination of when Kawashima should have known nor the court's assessment of whether the intervention would inject further complexity into the case exceeded the bounds of reason. The flip-side of Kawashima's argument—that failing to allow her claims to relate back to the filing date of this action would prejudice her—is that allowing her to thus expand the allowable recovery period under the statute of limitations would potentially prejudice the State by exposing it to greater liability.[12] Kawashima's claims are not foreclosed because she is in fact litigating them in a separate class action lawsuit. Plaintiffs cite no authority for the proposition that being precluded from avoiding a statute of limitations is the sort of prejudice that should be dispositive. The Circuit Court did in fact consider the totality of the circumstances in this case in determining that Kawashima's intervention was untimely; the court's reasoning is sound. We therefore conclude that the Circuit Court did not err in declining Kawashima's request for intervention.[13]

### F. The Order Re Third Amended Complaint

The State succinctly states its argument that the Circuit Court erred in allowing Plaintiffs to file the Third Amended Complaint as resting on the grounds of futility and untimeliness. Those grounds, as the State further explains, are subsumed in the State's arguments on sovereign immunity and the statute of limitations. The State makes no further argument on this point.

As this court has rejected the State's argument that sovereign immunity bars Plaintiffs' contract claims, we reject the State's argument that the filing of the Third Amended Complaint was futile. Similarly, as discussed in Section IV.G. below, we reject the State's argument that, under HRS § 661-5, the statute of limitations expired as to *all* of Plaintiffs' claims before suit was filed in 2002. Therefore, we reject the State's contention that the Circuit Court abused its discretion when it granted the Substitute Teachers leave to file the Third Amended Complaint in order to assert a contract claim.

### G. The Circuit Court's Application of HRS § 661-5

As the State acknowledges, in the court below, the State's argument was that pursuant to HRS § 661-5, November 8, 2000 was the cutoff date for the accrual of the Garner Plaintiffs' claims against the State. In Section IV.A. above, we concluded that the Circuit Court did not err in adopting the State's position and summarily ruling that HRS § 661-5 bars claims against the

---

**12.** Under HRCP Rule 15(c), not all amendments relate back to the date of the original pleading. In this case, although not raised on appeal and not an issue in light of our holding that the HRS § 302A-624(e) is a pay-mandating statute, the Substitute Teachers' Third Amended Complaint related back to the date of the original complaint because it arose out of the same conduct and transactions set forth in the original complaint. *See* HRCP Rule 15(c)(2); *see generally Eto v. Muranaka,* 99 Hawai'i 488, 500–02, 57 P.3d 413, 425–27 (2002) (second complaint did not relate back to the filing of the first complaint, which was never served, where plaintiff filed a second complaint in a new action after the first complaint was dismissed); *Mauian Hotel, Inc. v.*

*Maui Pineapple Co.,* 52 Haw. 563, 565–68, 481 P.2d 310, 312–14 (1971) (amended claims will not be barred if other party has been put on notice in· the original pleading regarding what evidence to gather, regardless of when the claim itself is asserted). We do not opine on whether the intervenor's claims would have related back to the date of the original complaint filed by the Garner Plaintiffs.

**13.** Because we conclude that the Circuit Court did not abuse its discretion in deciding that intervention was untimely, we need not reach the remaining factors of the *Kim* test. *See Ing,* 76 Hawai'i at 272, 874 P.2d at 1097.

State for back pay prior to November 8, 2000. On appeal, however, the State argues that its earlier position was incorrect and that all of Plaintiffs' claims accrued in February 1997 (or July of 1999)[14] and expired before the Garner Action was filed in 2002.[15]

The State's position depends on the underlying premise that the Plaintiffs alleged a breach of contract that "first accrued" in February 1997 (or July of 1999), rather than a continuing breach of contract. We begin with that premise.

The "first accrued" concept is taken directly from HRS § 661–5—"[e]very claim against the State, cognizable under this chapter, shall be forever barred unless the action is commenced within two years after the claim first accrues[.]" The parties agree that a claim accrues when the plaintiff knew or should have known that an actionable wrong has been committed. *See Vail v. Employees' Ret. Sys.*, 75 Haw. 42, 54–55, 856 P.2d 1227, 1235 (1993). Plaintiffs argue, however, that the State's breach of its contractual pay obligation was a "continuing violation" of the obligation to make proper payment and, accordingly, the Substitute Teachers' claims accrued with each paycheck that reflected an underpayment.

■ Hawai'i has long recognized that a continuing wrong may, in effect, toll the statute of limitations with respect to tortious conduct that is ongoing.[16] Under the continuing tort doctrine, while the statute of limitations is "tolled" by a continuing tortious act, recovery may be had only for damages accruing within the statutory period before the action, but *not* for damages accrued prior to that period. *Anderson v. State*, 88 Hawai'i 241, 250, 965 P.2d 783, 792 (App.1998), citing *Wong Nin v. City and County of Honolulu*, 33 Haw. 379, 386 (1935). In effect, the date that the tort "first accrues" moves forward into the future so long as the tortious conduct continues.

The federal courts have applied a similar analysis in "pay cases," holding that a new cause of action accrues at each pay period, and a plaintiff may recover the amounts which have become due during the applicable statute of limitations period prior to the filing of the action. *See, e.g., Ewer v. United States*, 63 Fed.Cl. 396, 400–01 (2005), citing *Cook v. United States*, 855 F.2d 848, 851 (Fed.Cir.1988); *Beebe v. United States*, 226 Ct.Cl. 308, 640 F.2d 1283, 1293 (1981); *Friedman v. United States*, 159 Ct.Cl. 1, 310 F.2d 381, 384–85 (1962); *Wason v. United States*, 179 Ct.Cl. 623 (1967); *Cosgriff v. United States*, 181 Ct.Cl. 730, 387 F.2d 390, 394 (1967); *Kutz v. United States*, 168 Ct.Cl. 68 (1964). It appears that other states have adopted this theory as well. *See, e.g., Hageland Aviation Servs., Inc. v. Harms*, 210 P.3d 444, 449 (Alaska 2009) ("a cause of action for unpaid overtime accrues at the end of each pay period in which overtime is due"); *Haliburton v. San Antonio*, 974 S.W.2d 779, 780–81 (Tx.App.1998); *Parker v. Schilli Transp.*, 686 N.E.2d 845, 849–50 (Ind. App.1997); *Cuadra v. Millan*, 17 Cal.4th 855, 859, 72 Cal.Rptr.2d 687, 690, 952 P.2d 704, 707 (1998), disapproved on another point by *Samuels v. Mix*, 22 Cal.4th 1, 91 Cal.Rptr.2d

14. In the State's Opening Brief, the State argues that the Garner Plaintiffs' claim accrued no later than February 1997, purportedly the date of the uniform downward shift in the teacher classification tables and the date of the new salary construct portion of the 1995–1999 collective bargaining agreement. In the State's Reply Brief, the State argues, instead, that the State's nonperformance of the alleged contract to pay the statutory rate was fully complete on July 1, 1999, reportedly the effective date of the 1999–2003 collective bargaining agreement with its salary schedule published four years into the future.

15. Given our analysis on the substantive issue, we need not wade too deeply into the parties' arguments concerning whether it is the duty of this court to now dismiss Plaintiffs' actions in their entirety based on a lack of subject matter jurisdiction stemming from the statute of limitations or, alternatively, to refuse to consider the arguments now raised by the State due to an inadequate factual record as to the earlier accrual date and the fundamental unfairness of the State's newly raised argument. This court recognizes, of course, that the issue of subject matter jurisdiction can be properly raised at any time. *See, e.g., Kapuwai v. City and County of Honolulu*, 121 Hawai'i 33, 211 P.3d 750 (2009), citing *Chun v. Employees' Ret. Sys. of State of Hawaii*, 73 Haw. 9, 13, 828 P.2d 260, 263 (1992).

16. *See Anderson v. State*, 88 Hawai'i 241, 248–50, 965 P.2d 783, 790–92 (App.1998); *Wong Nin v. City and County of Honolulu*, 33 Haw. 379, 386 (1935).

273, 989 P.2d 701 (Cal.1999); *Cal. Teachers Ass'n v. Los Angeles Cmty. Coll. Dist.*, 123 Cal.App.3d 947, 952, 177 Cal.Rptr. 168 (1981).

Although Hawai'i case law has not previously articulated this analysis with respect to the statute of limitations for breaches of contract in "pay cases," the same principle has been adopted in other matters involving periodic payments due. *See, e.g., Hi Kai Inv., Ltd. v. Aloha Futons Beds & Waterbeds, Inc.*, 84 Hawai'i 75, 929 P.2d 88 (1996) (recognizing that, under the common law, if a tenant breaches a lease, a landlord may elect to continue the tenancy and sue periodically for rent as it accrues); *Lindsey v. Lindsey*, 6 Haw.App. 201, 205, 716 P.2d 496, 499 (1986) (adopting majority rule that the statute of limitations begins to run on each court-ordered child support payment as it becomes due).

For these reasons, we adopt the view of the federal courts and the other states that hold that the statute of limitations applicable to periodic pay claims begins to run on each paycheck as it becomes due. Thus, we conclude that, while Plaintiffs' claim for back pay due prior to November 8, 2000 are barred by HRS § 661–5, Plaintiffs' claims for pay due from November 8, 2000 onward are not barred by the statute of limitation.

## H. *The Circuit Court's Findings that the State Breached Its Pay Obligations to the Substitute Teachers*

Finally, we consider the State's related arguments that the Circuit Court erred in finding (1) the existence of a contract between the State and Plaintiffs for a per diem rate greater than what was offered and accepted, and (2) that the State violated its contractual obligations by not paying the per diem rate specified in HRS § 302A–624(e). Specifically, the State challenges the following part of the Circuit Court's ruling in Partial Summary Judgment Order # 2:

Under Section 302A–624(e), during the applicable period, the DOE was required to pay substitute teachers a per diem salary based upon the annual entry step salary rate established by the Unit 5 Collective Bargaining Agreement in effect at the applicable times for certified and/or, as of

2001, a licensed teacher based upon four acceptable years of college education and other DOE license requirements.

There was no waiver by Plaintiffs of their right to the rate of pay specified in HRS § 302A–624(e) and the parties' contracts do not bar Plaintiffs' claims to the rate of pay specified in the statute. The Contracts specifically obligate the Defendants to pay the per diem compensation prescribed by HRS § 302A–624(e), not some lesser amount.

Therefore Plaintiff's Motion is granted insofar as the Court holds that the DOE violated its contractual obligation to pay the per diem rate prescribed by HRS § 302A–624(e) during the period from November 8, 2000 to June 30, 2005. Defendants' motion is denied insofar as it seeks summary judgment on that contract claim.

Any analysis concerning whether a summary judgment ruling is right or wrong involves two considerations, whether there is a genuine issue as to any material fact and whether the moving party is entitled to judgment in that party's favor, as a matter of law, upon all or any part of the party's claim. HRCP Rule 56(a) & (c).

The State's argument that there is a genuine issue of material fact concerns whether there was mutual assent to a per diem rate other than the rate specified in the offer and acceptance. The State argues that the parties mutually assented only to the per diem rate publicized in job-offering flyers, a renewal reminder, and in a standard form known as SF–5A1.

■ It is axiomatic that a fact is material if proof of that fact would have the effect of establishing or refuting one of the essential elements of a cause of action or defense asserted by the parties. *See, e.g., Omerod v. Heirs of Kaheananui*, 116 Hawai'i 239, 254–55, 172 P.3d 983, 998–99 (2007); *Querubin v. Thronas*, 107 Hawai'i 48, 56, 109 P.3d 689, 697 (2005). Thus, we necessarily consider whether express *mutual assent* as to a particular per diem rate of pay—either the rate publicized by the State or the rate required under HRS § 302A–624(e)—establishes or

refutes an essential element of Plaintiffs' cause of action or the State's defense.

 We conclude that, under the particular circumstances of this case, the issue of mutual assent as to a per diem rate of pay other than required pursuant to HRS § 302A-624(e) is not material because: (1) it is undisputed that an essential and material part of the parties' agreement was that the Substitute Teachers' pay was "subject to applicable State laws . . . [;]" and (2) the parties could not contract to violate a law determining a rate of pay, whether it be more or less pay than directed by the Legislature. *See Hino v. Kim*, 53 Haw. 492, 494–95, 497 P.2d 562, 564 (1972) (holding that a pay schedule adopted by the Board of Education, which conflicted with a pay schedule enacted by the Legislature, was "invalid and void"); *see also, e.g., Armstrong v. School Dist. Five*, 26 F.Supp.2d 789, 794 (D.S.C.1998) (holding that a public entity cannot materially alter or add to law in any fashion which circumvents legislation); *Peralta Fed'n of Teachers v. Peralta Comty. Coll.*, 24 Cal.3d 369, 386–88, 595 P.2d 113, 124–25, 155 Cal.Rptr. 679 (Cal. 1979) (awarding back pay to part-time teachers pursuant to statute mandating pro rata payment structure, despite contract provision providing for hourly pay). Thus, a disputed issue regarding mutual assent as to a rate of pay different than a rate of pay required by HRS § 302A-624(e) cannot have the effect of establishing or refuting any claim or defense and, therefore, is not material. The contract between the parties clearly required payment in accordance with applicable State law.

 The State further argues that, even if it was required to pay the Substitute Teachers in accordance with applicable State law, HRS § 302A-624(e) was not the only applicable State law. Specifically, the State contends that Act 364, 1993 Haw. Sess. L. 1021, HRS § 302A-624(a), HRS § 89-9 as amended by Act 364, and certain collective bargaining agreements also apply. The State points to "an outdated Class II *title* from before the classification/salary reform" in HRS § 302A-624(e), and suggests that tying Substitute Teachers' pay to that outdated classification might create inequity in the Substitute Teachers' pay scale that the

Legislature did not intend when enacting HRS § 302A-624(e).

This argument was aptly addressed by the Circuit Court in its discussion of the Legislature's intent in its use of the term "Class II" teacher in HRS § 302A-624(e). A review by the Circuit Court of the history of the term "Class II" teacher, going back to "1941 when the territorial legislature apparently first enacted 'classes' of teachers," revealed the forward-looking system that was envisioned when creating the classification structure. The House Committee of the Whole report explained the criteria the new classification system would employ:

> 2. The definition of classes into which the teaching staff is divided has been amended so that the reference is not to the title of certificates now granted (**as the titles may in the future be changed) but to the qualifications for those certificates[.]**

1941 S.J., House Committee of the Whole Report, p. 313 (emphasis added).

Since 1941, when the classification of "Class II" teacher was defined as a teacher with four years of college education, the "Class II" definition has changed several times. In 1996, when the Legislature enacted HRS § 302A-624(e), a "Class II" teacher was defined by HRS 302A-618(b)(2) as "any teacher who holds a certificate issued by the DOE based upon four acceptable years of college education and other requirements as may be established by the DOE." Act 89, 1996 Haw. Sess. L. 141. In 2001, the Legislature eliminated the teacher classification definitions in HRS 302A-618, which included "Class II," and modified the certification requirement to a license requirement. Act 312, 2001 Haw. Sess. L. 905.

Based upon the clear legislative intent not to tie classification to a particular title but rather to the qualifications of a teacher, we agree with the Circuit Court's analysis that, in enacting HRS § 302A-624(e), the 1996 Legislature did not intend to irrevocably tie the substitute teachers' pay to a transitory "Class II" title. Since a 1989 amendment to HRS § 297-33, the predecessor to HRS

§ 302A–624(e),[17] the applicable statute linked a substitute teacher's pay to the contract pay of full-time teachers who possess an appropriate four years of college education and also meet other DOE requirements. *See* Act 286, 1989 Haw. Sess. L. 622.

We reach the same conclusion as the Circuit Court regarding the continued applicability of HRS § 302–624(e) to the Substitute Teachers' contract terms, through June 30, 2005. Notwithstanding the subsequent changes in the "Class II" classification designation, "the 1996 legislature's deliberate choice [was] to tie a substitute teacher's pay to that of a regular full-time certified teacher based on an appropriate four years of college and other DOE requirements[.]" Therefore, HRS § 302A–624(e) continued to govern the pay terms of the parties' agreement and the statute continued to tie the Substitute Teachers' pay to that of full-time teachers who possess an appropriate four years of college education and also meet other DOE requirements, until the effective date of Act 70 in 2005. There is no merit in the State's contention that HRS § 302A–624(e) was rendered inapplicable because of legislative changes to the definition of "Class II." As teacher qualifications, not the classification title, connected substitute teacher pay to that of certain union member teachers, we reject the State's argument that the change in the definition of a Class II teacher severed the connection between the per diem rate for substitute teachers and the salary rate of certain licensed full-time teachers with four-year degrees.

As a ruling on the application of the rate of per diem pay is not before us on this interlocutory appeal, we do not address the amounts of pay back due to the Substitute Teachers.

## V. *CONCLUSION*

For the reasons set forth above, we affirm the Circuit Court's Interlocutory Orders, except to the extent that Partial Summary Judgment Orders # 1 and # 2 are inconsistent with our conclusion that HRS § 302A–624(e), as a pay-mandating statute, provided an alternative basis for invoking the court's

jurisdiction under the "founded upon any statute" language in HRS § 661–1.

---

**17.** In 1989, various Chapters in HRS Title 18, Education, were repealed, including Chapter 297, Personnel of Public Schools, and reorganized into Chapter 302A, Education.