**NOT FOR PUBLICATION IN WEST'S HAWAI'I REPORTS AND PACIFIC REPORTER**

**Electronically Filed
Intermediate Court of Appeals
CAAP-23-0000670
14-APR-2026
07:51 AM
Dkt. 97 MO**

NO. CAAP-23-0000670

IN THE INTERMEDIATE COURT OF APPEALS

OF THE STATE OF HAWAI'I

ANN SAKAGUCHI, Plaintiff-Appellant,
v.
UNIVERSITY OF HAWAI'I; DENISE KONAN,
individually and in her capacity as Dean of the
University of Hawai'i at Mānoa College of Social Sciences,
Defendants-Appellees,
and DOE INDIVIDUALS AND ENTITIES 1-10, Defendants

APPEAL FROM THE CIRCUIT COURT OF THE FIRST CIRCUIT
(CASE NO. 1CC181000321)

**MEMORANDUM OPINION**
(By: Nakasone, Chief Judge, Hiraoka and Wadsworth, JJ.)

Ann **Sakaguchi** appeals from the *Final Judgment* for the University of Hawai'i (**UH**) and Denise **Konan**, entered by the Circuit Court of the First Circuit.[1]

We hold: **(1)** Sakaguchi's claim for intentional infliction of emotional distress was barred by the exclusive remedy provision of the Workers' Compensation Law; **(2)** claims based on separate, distinguishable violations of the Hawai'i Whistleblowers' Protection Act (**HWPA**) that occurred over two years before she sued were time-barred, but claims for alleged violations that occurred within the two years before she sued, and her claims for pay differential and earning disparity beginning two years before she sued, were not time-barred; **(3)(a)** her claim for not being named department chair was not subject to

---

[1]    The Honorable Dean E. Ochiai presided.

a collective bargaining agreement and should have been allowed, but only for pay differential beginning two years before she sued, and **(b)** her earning disparity claim was subject to a collective bargaining agreement, but should have been allowed under Hawaii Revised Statutes (**HRS**) § 378-66(b), and limited to disparity beginning two years before she sued; and **(4)** the Circuit Court did not err by granting summary judgment for UH on claims (other than for pay differential and earning disparity) based on alleged HWPA violations that occurred within two years before she filed her complaint.

We affirm the Final Judgment in part and vacate it in part, and remand for further proceedings.

## I.  BACKGROUND

Sakaguchi sued UH and Konan on February 28, 2018. Konan was sued as an individual and as Dean of the University of Hawaiʻi Mānoa College of Social Sciences.  Sakaguchi's amended complaint asserted four claims: (1) violation of HRS § 378-62 (part of the HWPA); (2) tortious interference with prospective economic/business advantage; (3) interference with prospective contractual relations; and (4) intentional infliction of emotional distress (**IIED**).

Claims 2 and 3 were dismissed by stipulation.  In a series of orders, the Circuit Court dismissed or entered summary judgment against Sakaguchi on Claim 1 (HWPA) and Claim 4 (IIED). The Final Judgment was entered on October 9, 2023.  This appeal followed.  Only the HWPA and IIED claims against UH are at issue.[2]

## II.  POINTS OF ERROR

Sakaguchi contends[3] the Circuit Court erred by: **(1)** dismissing her IIED claim based on the workers' compensation exclusive remedy statute, HRS § 386-5; **(2)** dismissing her "Pre-

---

[2]    Sakaguchi has not appealed the summary judgment on her HWPA claim, or the dismissal of her IIED claim, against Konan.

[3]    We have re-ordered and partially consolidated Sakaguchi's points of error.

February 28, 2016 Retaliatory Claims" based on the statute of limitations and treating UH's statute of limitations defense as a jurisdictional issue; **(3)** entering summary judgment for failure to exhaust her remedies under the University of Hawaiʻi Professional Assembly collective bargaining agreements (**CBAs**); and **(4)** granting summary judgment on her post-February 28, 2016 HWPA claims.

### III. STANDARDS OF REVIEW

#### A.   Motion to Dismiss

Orders granting motions to dismiss are reviewed *de novo*.  Kealoha v. Machado, 131 Hawaiʻi 62, 74, 315 P.3d 213, 225 (2013).  We assume the facts alleged in the complaint are true and view them in the light most favorable to the plaintiff to see if they warrant relief under any legal theory.  Id.  We are not required to accept conclusions about the legal effect of the facts alleged, id., but we bear in mind that Hawaiʻi is a notice-pleading jurisdiction where legal theories need not be pleaded with precision, Bank of Am., N.A. v. Reyes-Toledo, 143 Hawaiʻi 249, 259, 428 P.3d 761, 771 (2018), overruled on other grounds by Wilmington Savs. Fund Soc'y v. Domingo, 155 Hawaiʻi 1, 556 P.3d 347 (2024).

#### B.   Motion for Summary Judgment

We review a grant of summary judgment *de novo*.  Ralston v. Yim, 129 Hawaiʻi 46, 55, 292 P.3d 1276, 1285 (2013).  Summary judgment is appropriate if the evidence shows there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.  Id.  A fact is material if proof of that fact would establish or refute an essential element of a party's cause of action or defense.  Id. at 55-56, 292 P.3d at 1285-86.  The evidence must be viewed in the light most favorable to the non-moving party.  Id. at 56, 292 P.3d at 1286.

"[F]indings of fact made by a trial court in relation to a summary judgment ruling are not binding on appeal, nor do

3

they alter our *de novo* standard of review regarding a summary judgment ruling." Hilo Bay Marina, LLC v. State, 156 Hawaiʻi 478, 487, 575 P.3d 568, 577 (2025).

## IV. DISCUSSION

**A.  Sakaguchi's IIED claim, which was not based on sexual harassment or sexual assault, was barred by HRS § 386-5.**

Sakaguchi was employed by UH.  UH moved to dismiss her IIED claim,[4]  arguing it was barred by the Hawaiʻi Workers Compensation Law's exclusive remedy provision.  The motion was filed under Hawaiʻi Rules of Civil Procedure (**HRCP**) Rule 12(b)(6) and presented no evidence outside the pleadings.  Sakaguchi's opposition presented no evidence outside the pleadings.  We disregard the declarations and exhibits attached to UH's reply memorandum.

HRS § 386-5 (2015) provides:

> The rights and remedies herein granted to an employee . . . on account of a work injury suffered by the employee shall exclude all other liability of the employer to the employee, . . . at common law or otherwise, on account of the injury, ***except for sexual harassment or sexual assault and infliction of emotional distress*** or invasion of privacy ***related thereto***, in which case a civil action may also be brought.

(Emphasis added.)

The supreme court has held:

> Based on a plain reading, HRS § 386-5 unambiguously provides that claims for infliction of emotional distress . . . are not subject to the exclusivity provision when such claims arise from claims for **sexual harassment** or **sexual assault**, in which case a civil action may be brought. Inasmuch as [plaintiff] has alleged a claim for emotional distress, that does **not** arise out of sexual harassment or sexual assault, such claim is, pursuant to HRS § 386-5, barred.

---

[4]  A plaintiff claiming IIED must show that the defendant's conduct: (1) was intentional or reckless; (2) was outrageous; and (3) caused extreme emotional distress. Goran Pleho, LLC v. Lacy, 144 Hawaiʻi 224, 237, 439 P.3d 176, 189 (2019).  The term "outrageous" has been construed to mean "without just cause or excuse and beyond all bounds of decency." Id.

4

Kamaka v. Goodsill Anderson Quinn & Stifel, 117 Hawaiʻi 92, 109, 176 P.3d 91, 108 (2008) (bold italics added).

Here, the allegations in Sakaguchi's amended complaint, viewed in the light most favorable to her, do not allege she was sexually harassed or sexually assaulted.

Sakaguchi argues HRS § 386-5 does not bar her IIED claim because her amended complaint alleged she was discriminated against "after she complained about suspected Equal Pay Act violations[.]" She relies on Furukawa v. Honolulu Zoological Society, 85 Hawaiʻi 7, 936 P.2d 643 (1997) and Takaki v. Allied Machinery Corp., 87 Hawaiʻi 57, 951 P.2d 507 (App. 1998).

The claims in Furukawa were for discriminatory employment practices in violation of HRS § 378-2 (Supp. 1996).[5] The Hawaiʻi Civil Rights Commission (**HCRC**) has jurisdiction over claims under HRS § 378-2. See HRS § 378-4 (Supp. 1996 & 2015). The supreme court actually ruled: "The law is explicit that 'a workers' compensation claim or remedy does not bar relief on claims filed with the [HCRC].'" 85 Hawaiʻi at 19, 936 P.2d at 655 (quoting HRS § 368-17(b)). Sakaguchi's amended complaint does not allege that UH violated HRS § 378-2.

Takaki also involved an alleged violation of HRS § 378-2. There, we held that "Furukawa would permit Takaki to maintain an action against Appellees for intentional infliction of emotional distress caused by terminating him in violation of HRS § 378-2." 87 Hawaiʻi at 68, 951 P.2d at 518.

---

[5] HRS § 378-2 (Supp. 1996) provided, in relevant part:

It shall be an unlawful discriminatory practice:

(1) Because of race, sex, sexual orientation, age, religion, color, ancestry, disability, marital status, or arrest and court record:

(A) For any employer to refuse to hire or employ or to bar or discharge from employment, or otherwise to discriminate against any individual in compensation or in the terms, conditions, or privileges of employment[.]

Furukawa, 85 Hawaiʻi at 9 n.1, 936 P.2d at 645 n.1.

Sakaguchi's amended complaint did not allege she was discriminated against in violation of HRS § 378-2. It alleged she was discriminated against, in violation of the HWPA, because she complained about UH violating the Equal Pay Act. Her IIED claim against UH was barred by HRS § 386-5.[6] <u>Kamaka</u>, 117 Hawaiʻi at 109, 176 P.3d at 108.

> **B. The Circuit Court lacked jurisdiction over Sakaguchi's claims based on separate, distinguishable HWPA violations that occurred before February 28, 2016; her claims for pay differential and earning disparity after February 28, 2016 are not time-barred.**

Sakaguchi filed her complaint on February 28, 2018. UH moved for summary judgment on the HWPA claims that accrued before February 28, 2016. UH relied on the HRS § 661-5 two-year statute of limitations. The Circuit Court treated the motion as one to dismiss for lack of jurisdiction,[7] and granted it.

Sakaguchi argues that the Circuit Court erred by basing its ruling on lack of jurisdiction, and that her claims for pre-February 28, 2016 discrimination were not time-barred under the continuing tort doctrine.

HRS § 378-62 (2015) provides, in relevant part:

> An employer shall not discharge, threaten, or otherwise discriminate against an employee regarding the employee's compensation, terms, conditions, location, or privileges of employment because:
>
> > (1) The employee . . . reports or is about to report to the employer, or reports or is about to report to a public body, verbally or in writing, a violation or a suspected violation of:
> >
> > > (A) A law, rule, ordinance, or regulation, adopted pursuant to law of this State, a political subdivision of this State, or the United States; or

---

[6] Sakaguchi did not argue, to the Circuit Court or on appeal, that she asserted an IIED claim against Konan under HRS § 386-8(k).

[7] A court deciding an HRCP Rule 12(b)(1) motion to dismiss for lack of subject matter jurisdiction may review evidence outside the pleadings to resolve factual disputes over the existence of jurisdiction. <u>Yamane v. Pohlson</u>, 111 Hawaiʻi 74, 81, 137 P.3d 980, 987 (2006).

> (B) A contract executed by the State, a
> political subdivision of the State, or the
> United States,
>
> unless the employee knows that the report is
> false[.]

The HWPA is a remedial statute, liberally construed to accomplish the purpose for which it was enacted. Crosby v. Dep't of Budget & Fin., 76 Hawaiʻi 332, 341–42, 876 P.2d 1300, 1309–10 (1994). Sakaguchi has the burden to prove she engaged in protected conduct, and that it was a "substantial or motivating factor" for UH engaging in prohibited conduct. Id. at 342, 876 P.2d at 1310. If she sustains her burden of proof, the "employer can defend affirmatively by showing that the [prohibited conduct] would have occurred regardless of the protected activity." Id.

### (1) HRS § 661-5 imposes a jurisdictional limitation on the State's consent to be sued.

UH is a department of the State. HRS § 26-4(7) (2009). It is an "employer" under the HWPA. HRS § 378-61 (2015). The circuit courts have jurisdiction over HWPA claims against UH under HRS § 304A-108(a)[8] (2007) and HRS § 661-1(1) (2016). "HRS § 661-1 . . . contains a limited waiver of sovereign immunity for claims against the State of Hawaiʻi that are founded upon a statute[.]" Garner v. State, 122 Hawaiʻi 150, 160, 223 P.3d 215, 225 (App. 2009).

HRS § 661-5 (2016) provides, in relevant part:

> Every claim against the State, cognizable under this part, shall be forever barred unless the action is commenced within two years after the claim first accrues[.]

---

[8] HRS § 304A-108(a) (2007) provides, in relevant part:

> Notwithstanding any other law to the contrary, all claims arising out of the acts or omissions of the university . . . its officers, or its employees, including claims permitted against the State under chapter 661, part I, . . . may be brought only pursuant to this section and only against the university. . . . All defenses available to the State, as well as all limitations on actions against the State, shall be applicable to the university.

An HWPA claim accrues when the employee knows or should have known, Blair v. Ing, 95 Hawaiʻi 247, 264, 21 P.3d 452, 469 (2001), that their employer has *taken adverse action* because of the employee's protected activity, Andrade v. County of Hawaiʻi, 145 Hawaiʻi 265, 277, 451 P.3d 1, 13 (App. 2019).

The legislature did not consent to UH being sued for violating the HWPA over two years after the claim first accrued. The time bar is jurisdictional. Cf. Okutsu v. State, 153 Hawaiʻi 192, 196, 528 P.3d 956, 960 (App. 2023) (holding that State Tort Liability Act statute of limitations, HRS § 662-4 (2016), "is a term of the legislature's consent for the State to be sued in tort"). Thus, if a lawsuit alleging UH violated the HWPA is filed "more than two years after the claim accrued, state courts have no subject matter jurisdiction over the claim." Cf. id. at 199, 528 P.3d at 963.

### (2) The Circuit Court lacked jurisdiction over HWPA claims based on separate, distinguishable violations that occurred before February 28, 2016.

Sakaguchi does not controvert that she knew, before February 28, 2016, that she was excluded from specific grant applications, funding opportunities, projects, meetings, conferences, legislative hearings, and initiatives. The Circuit Court lacked jurisdiction over the HWPA claims based on those alleged violations. The Circuit Court also lacked jurisdiction over Sakaguchi's claim based on Konan allegedly threatening to take away her project space and causing her computer servers to become intermittently inaccessible in 2015.

The continuous tort doctrine does not apply to those claims under the circumstances of this case, because Sakaguchi alleged a series of separate, distinguishable violations by UH and Konan. See Boyd v. Univ. of Haw., No. 30547, 2012 WL 503797, at *3 (Haw. App. Feb. 13, 2012) (mem. op.) (holding that continuous tort doctrine did not apply where HWPA claimant alleged "a series of separate and distinguishable acts"), cert. rejected, No. SCWC-30547, 2012 WL 2026001 (Haw. June 4, 2012).

8

**(3)  Sakaguchi's claims for pay differential and earning disparity after February 28, 2016 are not time-barred.**

Sakaguchi's amended complaint alleged that her Department of Anthropology colleagues recommended she become department chair in February 2014, but Konan rejected the recommendation, which deprived her of a pay increase.

Although the alleged HWPA violation occurred over two years before Sakaguchi sued UH, the statute of limitations for her periodic pay claim begins to run on each paycheck as it becomes due.  Garner, 122 Hawaiʻi at 169, 223 P.3d at 234. Sakaguchi's claim for pay differential (for being wrongfully not selected department chair) before February 28, 2016 is barred by HRS § 661-5, but her claim for additional pay due from February 28, 2016 onward is not time-barred.  Id.

Sakaguchi's amended complaint also alleged:

> 37.    Despite Dr. Sakaguchi's contributions, experience, and state, national and international recognition in her field, her earnings are near the bottom 10th percentile compared to similarly situated UHM faculty, who are paid at rates in the 75th percentile or higher.

The claim for earnings disparity after February 28, 2016, caused by UH's violation of the HWPA is not time-barred. Garner, 122 Hawaiʻi at 169, 223 P.3d at 234.

**C.    Sakaguchi's claim for not being named department chair was not subject to a CBA; her claim for earnings disparity was subject to a CBA but was actionable under HRS § 378-66.**

UH argued that Sakaguchi "fail[ed] to exhaust all administrative remedies with respect to submitting a request for pay increases for merit, equity or market as a Special Salary Adjustment ("SSA") pursuant to the Collective Bargaining Agreement ("CBA") between the University of Hawaiʻi Professional Assembly and the University of Hawaiʻi Board of Regents."  Copies of the CBAs were appended to UH's motion for summary judgment.

9

UH argues that Sakaguchi "could have submitted an SSA request if she sought an increase in her salary from the University based on merit and equity principles."  But Sakaguchi's amended complaint did not allege she was entitled to, or wrongfully deprived of, an SSA based on merit, equity, or market.  Her claim for back- and front-pay was made under HRS § 378-64, as a remedy for Konan wrongfully rejecting her colleagues' recommendation she be named department chair.  The CBAs do not provide for an award of back- or front-pay for UH's violation of the HWPA.  The exhaustion-of-administrative-remedies requirement does not apply to that claim.

Sakaguchi's earnings disparity claim is covered by the CBAs.  But HRS § 378-66 (2015) provides, in relevant part:

> (b)   . . . Where a collective bargaining agreement provides inferior rights and remedies to those provided in this subpart, the provisions of this subpart shall supersede and take precedence over the rights, remedies, and procedures provided in collective bargaining agreements.

The HWPA provides remedies including "injunctive relief, or actual damages, or both within two years after the occurrence of the alleged violation[,]" HRS § 378-63(a) (2015), and "payment of back wages, full reinstatement of fringe benefits and seniority rights, actual damages, or any combination of these remedies. . . . [and] all or a portion of the costs of litigation, including reasonable attorney's fees and witness fees," HRS § 378-64 (2015).  Sakaguchi was not required to exhaust the remedies available to her under the CBAs before proceeding with her earnings disparity claim under the HWPA, which provides rights and remedies superior to those provided by the CBAs.

**D.    The Circuit Court did not err by granting summary judgment for UH on Sakaguchi's other post-February 28, 2016 HWPA claims.**

UH moved for summary judgment on Sakaguchi's remaining HWPA claims — those based on alleged violations occurring after February 28, 2016.  Because Sakaguchi had the burden of proof at

trial, Crosby, 76 Hawaiʻi at 342, 876 P.2d at 1310, UH had the burden to show (1) there was no genuine issue of material fact on the essential elements of the claim addressed by the motion, and (2) the uncontroverted facts entitled it to judgment as a matter of law. Ralston, 129 Hawaiʻi at 56, 292 P.3d at 1286.

If UH satisfied its burden, Sakaguchi had to "demonstrate specific facts, as opposed to general allegations, that present a genuine issue worthy of trial." Ralston, 129 Hawaiʻi at 56-57, 292 P.3d at 1286-87.

UH's motion dealt with nine alleged violations of the HWPA that occurred after February 28, 2016.

**(1)** Sakaguchi claimed to have been "excluded" from the Pacific Pandemic Preparedness Hui workshop in March 2016. Her response to a UH interrogatory stated:

> I am talking about the Pacific Pandemic Preparedness Conference that has been noted in our previous documents. This conference was held on March 14-15, 2016 in Saunders Hall in the same building that my office is in, four floors above, in the SSRI office. She was the opening speaker because it is in the Social Sciences building, however, and not because of her expertise. I had designed pandemic avian influenza training and worked with the College of Tropical Agriculture in 2006 and am probably the only one in my College with that experience. I thought I could have benefited [sic] from attending and contributed to the dialogue. My colleagues in the field from out-of-state visited me at my office so we could walk together to the conference, not knowing that I had not even been invited by the College to attend. They were surprised. However, they informed me that they paid several hundred dollars in conference fees to attend but were required to write parts of the grant and a matching powerpoint [sic] presentation for Kim to obtain funding from a granting agency for two days.
>
> In September 2016, Konan states she was a co-organizer and the event was public so anyone could attend. She misses the point. There was a fair day dedicated to preparedness where disaster information and documents were shared. NDPTC [(the National Disaster Preparedness Training Center)] and others were present at the fair. I was unable to participate in the fair and share my work, which would help publicize my program. Konan continues to involve only Kim while denying all opportunities for me to participate in this field at the college and campus level.

UH submitted Konan's declaration, which stated that Sakaguchi "was never intentionally excluded from any workshop,

projects or opportunities between 2016 between [sic] March 2016 to October 14, 2018 as she alleges."  Konan specifically stated:

> 5.    With respect to the March 2016 Pacific Pandemic Preparedness Health Hui workshop at [sic] occurred at the Saunders Building at the University of Hawaii at Manoa, I was invited to give some opening remarks in my capacity as the Dean of the College of Social Sciences by the Pacific Risk Management Ohana (also known as PRiMO), but was not involved in organizing this two day event or inviting the participants who were members of PRiMO as it was being coordinated by Gregg Nakano whose organization I understood extended invitations to individuals who had maintained and/or requested a professional affiliation with or membership in PriMO.  This would apply to the October 4, 2018 Pacific Pandemic Preparedness Summit (1918 Centennial) which was organized by PRiMO over which I had absolutely no involvement, participation, or control over any invitations to that event to PRiMO members.

Konan's declaration satisfied UH's burden of production under Ralston.

Sakaguchi submitted a declaration in opposition.  It stated:

> 14.    In March 2016, I was excluded from a special workshop held at UH entitled the Pacific Pandemic Preparedness Hui that was organized by the Pacific Risk Management Ohana, even though the subject matter of the workshop was directly related to my Pacific EMPRINTS work. Defendant Konan was a key speaker at this workshop.
>
> . . . .
>
> 34.    Defendant Konan continues to engage in gaslighting.  Certain faculty members of the College of Social Sciences were personally invited to the March 2016 Health [sic] Hui workshop, whereas I was not, even though my program, Pacific EMPRINTS, provided training in pandemics and is recognized at the national level for this training.
>
> 35.    The UN-UH Pacific Preparedness Summit in October 2018 is a collaboration on Human Security Studies degree program. Denise Konan claims it involved PRIMO.  It is a degree program therefore the UH is involved.  PRIMO is involved with natural hazards in the Pacific Island communities.
>
> . . . .
>
> 38.    . . . Not informing me of workshops . . . denies me the chance to participate as an expert in workshops relevant to my field, and diminishes my reputation in the field that I have built up.

Sakaguchi did not show specific material facts by, for example, submitting declarations from other faculty members

stating Konan had invited them to the March 2016 Pacific Pandemic Preparedness Hui workshop but said to not include Sakaguchi.  She did not sustain her burden to "demonstrate specific facts, as opposed to general allegations, that present a genuine issue worthy of trial."  Ralston, 129 Hawaiʻi at 56-57, 292 P.3d at 1286-87.

**(2)**  Sakaguchi claimed to have been "excluded" from the Great Tsunami in Japan Conference in September 2016.  UH submitted a declaration from its College of Social Sciences Systems Manager, Harry **Partika**, stating that on September 7, 2016, he "transmitted a College of Social Sciences' Event Notice on 'The Great Tsunami in Japan['] documentary premiere scheduled for September 17, 2016 to the entire faculty of the College of Social Sciences which included Ann Sakaguchi."

Sakaguchi did not deny receiving Partika's event notice.  Her declaration in opposition stated:  "In September 2016, I was excluded from the Great Tsunami in Japan Conference held at UH which I understand was organized in part by Defendant Konan."  This general allegation did not present a genuine issue of material fact about whether UH excluded her from the event.

**(3)**  Sakaguchi claimed to have been "excluded" from (a) a 2016 Lloyd's Register Foundation event, (b) public hearings on Senate Bill No. 257 and House Bill No. 2582, and (c) an April 2018 Memorandum of Understanding between the Commander of the United States Navy Pacific Command and the UH President.

**(a)**  Konan's declaration stated:

> 6.    As for [Sakaguchi]'s claim that she was personally excluded from the Lloyd's Register Foundation ("Foundation") in March 2016, there was no workshop and my sole involvement in 2016 was responding to a March 9, 2016 email from Michael Bruno stating that he had personal hopes that University of Hawaiʻi could obtain "some funding from Lloyd's to convene a workshop and jump-start this activity at UH."  In my email to Michael Bruno, I had attached a University of Hawaiʻi Disaster Risk Reduction & Resiliency Landscape Assessment that included [Sakaguchi]'s biographical information as the Director of Pacific EMPRINTS and her role in emergency management and preparedness.  But there was no activity on March 9, 2016 that [Sakaguchi] was excluded or denied an opportunity from and there were no grant or funding opportunities offered by this Foundation in 2016 that I am aware of.

UH Mānoa Provost Michael S. **Bruno** submitted a declaration stating:

> 10. I am also personally familiar with the Lloyd's Register Foundation ("Foundation") as I served as the Chair of the Advisory Board and do remember passing along *information about the Foundation* to several faculty members in the College of Social Sciences which could have included both Dr. Karl Kim and Dr. Ann Sakaguchi.
>
> 11. Unfortunately, the Foundation did not offer any grants or funding opportunities to the University of Hawaiʻi at Manoa.

(Emphasis added.)

Sakaguchi declared:

> 36. Provost Bruno mentions the possibility of involving me in the Lloyd [sic] Foundation initiatives in **October 2016** but Denise Konan or her staff did not contact me and therefore excluded me from a potential opportunity. I did not know that Provost Bruno had suggested my name until **after 2018**, i.e., after discovery of this case.
>
> . . . .
>
> 40. As the dean of the College of Social Sciences, Denise Konan is kept in the loop of various funding opportunities by the administration, not me. Konan declared herself as the "POC" (point of contact) based on an informal declaration from former University president Greenwood to establish a University disaster management discipline. Attached as Exhibit "15" is a true and correct copy of an email from Defendant Konan to Michael Bruno dated March 14, 2016, reflecting that Konan is the POC.[9] She used that informal authority to unilaterally determine the level of participation by faculty in the initiative, even though she herself was not knowledgeable in the discipline. Given this POC designation, it is part of her responsibility as the POC

---

[9] Sakaguchi's Exhibit 15, a copy of an email from Konan to Bruno "Re: Lloyd's and Resilience Engineering" dated March 14, 2016, stated:

> Hi Michael,
> It was a pleasure to chat the other day! I'm really glad that you have a strong interest in disaster resilience. When I first started as Dean, President Greenwood wanted to rally our combined assets in this area to develop a new field of disaster sciences, and I was her POC. Velma and I put together the attached landscape assessment to demonstrate our considerable expertise in the field. At the time, we were launching the APDR3, which has since become "R3ady Asia Pacific," funded by Ford, Rockefeller, and Chevron. Of course, it is a few years old now!
>
> We have significant capacity and there would be strong benefits of having a campus led effort. Your suggestion of a workshop is very good.

of the university to notify faculty of these upcoming opportunities, well in advance of the date. None of the participants she selected possessed the scope and degree of disaster management that I could offer.

41. I would not be able to fully and actively participate as a speaker in a workshop, submit a proposal, or set up a booth if I was not advised or invited to these grants or workshops, in a timely manner.

42. I have expressed interest to attend workshops and related activities to Denise Konan a number of times, contrary to what she states in her declaration. The first such episode I recall was on April 25, 2012 when I met Denise Konan, with one of my instructors, Dr. Elizabeth Char, the Medical Director of the National Disaster Life Support Regional Training Center-Pacific, and current Director of the Department of Health in Denise Konan's office. It was at that meeting where Dr. Char and I both expressed interest in getting more involved with activities.

43. There were other workshops that I never knew about until discovery in this case, such as but not limited to the Rockefeller Foundation, Tohoku initiatives, PACOM initiatives, Lloyd Foundation and the Ford Foundation.

Sakaguchi's general allegations did not show Konan knew of specific events that Sakaguchi did not. Nor did Sakaguchi explain why, despite being the "Director of Pacific Emergency Management, Preparedness, and Response Information Network and Training Services ('Pacific EMPRINTS') since 2005 and Director of the National Disaster Life Support Regional Training Center-Pacific ('NDLS RTC-Pacific') since 2007[,]" Konan would have better access to information about third-party sponsored events related to Sakaguchi's own field of expertise.

**(b)** Konan's declaration stated:

8. On February 15, 2017 I did testify before the Senate Committees on Agriculture & Environment, Public Safety, Intergovernmental, [sic] & Military Affairs, & [sic] Higher Education to respond to Senate Bill No. 257, which proposed to establish a temporary food security task force at the national disaster preparedness training center at the University of Hawaii and deferred all comments to NDPTC, but requested that the Legislature "look into extending the reporting period as funding and coordination may take time to formalize", but this Bill never passed. Since this was a public hearing, I cannot exclude anyone from testifying or participating.

9. House Bill 2582 proposed a task force to make recommendations for the Hawaii Disaster Preparedness Plan, requiring NDPTC to assist the task force in preparing that Plan and at a February 8, 2018 Public Hearing, I merely provided information on the costs that would be incurred for NDPTC to carry out that request, but otherwise was never

15

involved in the drafting of this legislation or proposal of this Bill. Since this was a public hearing, I could not exclude anyone from testifying or participating.

Sakaguchi's declaration stated:

39. I did **not** state that Defendant Konan prevented me from testifying at the legislature for Senate Bill 257 in 2017. This is entirely fabricated. I stated that it was yet another example that I was excluded from a potential funding opportunity by Dean Konan. The fact that it received funding or not is irrelevant to the issue. It's the ability to have the same opportunity as any other faculty that is involved in the discipline. She claims the same for House Bill 2582 that she did **not** prevent me from testifying. I did not claim this either and it is another gaslighting fabricated statement by Denise Konan to discredit me.

Sakaguchi did not show she was prevented from testifying at public hearings, or from offering written testimony, on legislation relating to her own field of expertise.

**(c)** Konan's declaration stated:

10. Finally, on April 20, 2018, a Memorandum of Understanding (MOU) between the United States Pacific Command and the University of Hawaiʻi was signed by President David Lassner and the Admiral Harry B. Harris Jr, the U.S. Navy Commander for USPACOM to develop strategies and plans for collaborative research activities, identify shared educational opportunities, promote ongoing communications to identify opportunities for expanding future education and project related activities and collaborate on emerging technologies, research and innovation. This process began before I became Dean of the College of Social Sciences and involved then Presidents David McClain and subsequently MC Greenwood. The MOU did not exclude [Sakaguchi] from engagements with PACOM. I did not participate in the formation of this MOU.

Sakaguchi's declaration does not mention the Memorandum of Understanding, or explain how she could have been "excluded" from a document signed only by President Lassner and Admiral Harris.

Sakaguchi did not sustain her burden to show, by admissible evidence, a genuine issue of material fact about UH excluding her from these events.

**(4)** Sakaguchi's amended complaint alleged:

34. In May 2017, Dr. Sakaguchi complained to her union regarding Dr. Konan's failure to comply with the union's collective bargaining agreement, by failing to respond to Dr. Sakaguchi's request for sabbatical leave.

16

35. After Dr. Sakaguchi filed the December 2014 Grievance and made additional complaints in 2016 and 2017, her workplace environment became progressively more hostile. Instances of such hostility and retaliation that occurred from January 2015 to present include the following:

. . . .

h. In April 2017, Defendant Konan purported to have "lost" Dr. Sakaguchi's request for sabbatical paperwork that was submitted in January 2017.

UH Human Resources Specialist Patti Au submitted a declaration stating:

4. It is my recollection that after Dr. Sakaguchi submitted her request in February, 2017, the paperwork for the sabbatical was approved by Dr. Christian Peterson, but it was misplaced and when Dr. Peterson reminded me of the sabbatical request on April 6, 2017, I had informed him that I did not recall seeing the paperwork for Dr. Sakaguchi's sabbatical request and would check with the other staff in my office but that if there was a copy available, would he please send it over and our office could work off the copy.

5. After I received a copy of the paperwork for Dr. Sakaguchi's sabbatical request sometime after April 6, 2017 but prior to April 19, 2017, I handed the request to Dean Denise Konan and she approved it immediately.

6. On April 19, 2017 I notified Christian Peterson that "Ann's sabbatical leave has been approved for the period 11-01-17 to 04-30-18" and that a notification letter was forthcoming.

7. I do not believe that Dr. Sakaguchi's sabbatical request was intentionally delayed by Dean Denise Konan because when I handed her the copy of Dr. Sakaguchi's sabbatical request, she signed it immediately and this was slightly less than seven (7) months before Dr. Sakaguchi's planned sabbatical.

Sakaguchi's declaration stated:

17. In April 2017, Defendant Konan purported to have "lost" my request for sabbatical paperwork that I submitted in February 2017. Approximately six months prior to the February 2017 sabbatical request, I submitted another sabbatical request which Denise Konan rejected because the request had to be submitted six months before the start date of the sabbatical so the submission timeline is critical. Denise Konan responded to my request for a status of the sabbatical only after I called the union and notified them that I did not get a response to my sabbatical request.

. . . .

23. Patti Au's declaration states she recalls I submitted my sabbatical leave request in February 2017, which was misplaced for two months, and was found only after the Anthropology Department Chair Christian Peterson

17

> reminded her about it. Patty Au's declaration is inexplicable. It does not explain how a document as important as a sabbatical leave request can be misplaced for a period of two months. If not for my initiative, the request would never have been processed within the required deadlines denying my faculty rights to sabbatical leave.

Sakaguchi's declaration admits the sabbatical issue was covered under the CBA. See HRS § 378-66. It appears, however, that pursuing her administrative remedies was unnecessary because her sabbatical leave was approved well before it was scheduled to be taken. She did not meet her burden to show she was unlawfully deprived of sabbatical leave.

**(5)** Paragraph 35 of Sakaguchi's amended complaint alleged:

> j. In the later part of 2017, Dr. Sakaguchi attempted to hire a part-time, entry-level employee. Dr. Sakaguchi's routine request was sent to Vassilis L. Syrmos, UH Vice President for Research and Innovation, for approval. The College of Social Sciences Fiscal Officer remarked to Dr. Sakaguchi that the necessity of formal approval from Mr. Syrmos was highly unusual and was not required for other similar faculty requests.

In response to an interrogatory about that allegation, Sakaguchi stated:

> **ANSWER**: No hire was identified when the Research Associate position was requested to SSRI in late 2017. [Sakaguchi] later decided not to go forward with this hire, so the recruitment was promptly closed without making an offer to an individual.

Sakaguchi failed to show she was "discriminate[d] against . . . regarding [her] compensation, terms, conditions, location, or privileges of employment" when she attempted to obtain approval for a part-time research associate position. She did not show approval was denied, and she admitted deciding not to hire anyone for that position.

**(6)** Paragraph 35 of Sakaguchi's amended complaint alleged:

> i. Beginning in July 2017, Pacific EMPRINTS servers are again malfunctioning, likely at the direction of UH Administrators.

UH College of Social Sciences Systems Manager Partika's declaration stated:

4.    Back in 2007, I personally assisted in configuring to two web servers, SQL server and file/print serve [sic] for Ann Sakaguchi and Pacific EMPRINTS and Attachment "1" is a true and correct list of the Pacific EMPRINTS sever [sic] Planning Document prepared on March 20, 2007 that I helped set up.

. . . .

6.    Sometime in April or May 2015, Ann Sakaguchi had informed me that the Pacific EMPRINTS servers became inaccessible and the website had "crashed."

7.    The multiple problems with Pacific EMPRINTS' computer servers were not caused because any UH Administrator had allegedly "redirected the servers to other IP and MAC addresses" but rather were attributable to the need to upgrade the hardware, replace the main computer servers that were at least 7 or more years old and perform backup of the website data.. [sic]

8.    I had identified the particular computer components and servers as of July 6, 2015 that were existing and failing in Attachment "2".

9.    On July 7, 2015, Ann Sakaguchi received a quote of $14,969.60 for the estimated costs to purchase and maintain the virtual servers based on the items identified in Attachment "2" that recommended an upgrade of the hardware and Operating Systems for Microsoft Server 2013 what [sic] was not on warranty and lacked support from Microsoft.

10.    After Pacific EMPRINTS website returned online on July 7, 2015, Ann Sakaguchi reported that the estimated costs were too high and did not perform the recommended upgrades.

11.    On September 12, 2017 I reported to the UH hostmaster that Pacific EMPRINTS' webservers had "crashed due to significant hardware failure" of which Attachment "3" [is] a true and correct copy of said email that I sent.

12.    On October 18, 2017, the Pacific EMPRINTS' website went down again and I had informed her that the network switch was not the problem and instructed her to check the SQL server.

13.    On February 14, 2018, I had informed Ann Sakaguchi that "last August-September that the production web serve [sic] and data storage array were inoperable causing the SQL data to be lost because of no back up and needed to be replaced or upgraded but that the network switch did 'indeed work'".

14.    The multiple problems with Pacific EMPRINTS' computers are not attributable [sic] any failed network switch or redirection by UH Administrators to other IP and MAC addresses as claimed by Ann Sakaguchi.

Sakaguchi's declaration stated:

18.    Beginning in July 2017, Pacific EMPRINTS servers were malfunctioning, likely at the direction of UH Administrators.  I asked the UH IT Desk for help in late 2017 for a network switch recommendation but was informed that the protocol was to go through the College of Social Sciences IT Manager.  However, the College of Sciences IT Manager reports to Dean Konan, and would not assist me. This is similar to how, beginning in April 2015, the Pacific EMPRINTS servers became intermittently inaccessible, sometimes for as long as three months at a time.  In one instance, the UH Help Desk and other UH IT personnel informed me that the servers had been "redirected" by UH Administrators to other IP and MAC addresses.  During these periods, those interested in Pacific EMPRINTS courses were unable to enroll.

. . . .

30.    As the IT "manager" for the College of Social Sciences, Harry Partika is a gatekeeper and acts for Dean Konan in allocating resources to support information technology needs of faculty.  His technical skills are limited to that necessary to procure, install or repair desktop computers and related equipment typically required by faculty.  He does not possess the skills required to install, operate and trouble shoot complex servers.

31.    Harry Partika did not tell me that the network switch was fine.  I know this because he never responded to my calls and emails, so he couldn't have told me the network switch was fine.

32.    With regards to Pacific EMPRINTS server rack disclosure (Attachment 2 to the Motion), Harry Partika's statement of a non-working RAID Disk Storage as a significant problem exhibits his lack of technical knowledge of the server configuration.  He probably thought it was critical because the name contained the term, "Storage".  He was unaware that it did not contain any production site data.  The SQL server was operational and that is why it continued to work until 2017, when the network switch issue occurred.

33.    These are some of the computer specialists I hired to build my servers:

a.    Phil Page holds an IT and GIS (Geographic Information Systems) degree;

b.    Randy Glidden, a computer science graduate with SQL database background and programming experience;

c.    Chuan Su was my webmaster programmer who has a master's degree in computer programming.

d.    ArcGIS server specialists from ESRI in Redlands, California, who did the initial install and initial transfer of the "ESRI/GIS" server in 2007.

The UH IT team also assisted as necessary.

20

The Circuit Court correctly sustained UH's hearsay objection to Sakaguchi's statement in paragraph 31 that the "IT HELP desk said it might be a switch issue[.]"

We disregard the conclusory statements and opinions in paragraphs 30, 31, and 32 of Sakaguchi's declaration because she failed to show she had the education, training, or experience necessary to comment on the technical issues she purported to address, see Rule 702, Hawaii Rules of Evidence (**HRE**), Chapter 626, Hawaii Revised Statutes (2016), and she did not show she had personal knowledge of Partika's technical ability or what he "thought," see HRE Rule 602.

Sakaguchi did not rebut Partika's testimony that she did not perform the server upgrades he had recommended in 2015. Nor did Sakaguchi show, through declarations by Phil Page, Randy Glidden, Chuan Su, any "ArcGIS server specialists from ESRI in Redlands, California," or any other admissible evidence, that Pacific EMPRINTS' servers malfunctioned "at the direction of UH Administrators."

Partika's supplemental declaration authenticated several emails to and from Sakaguchi between October 2017 and February 2018. On October 18, 2017, Sakaguchi emailed Partika that "Chuan looked into this and thought this is a network switch issue and that it was likely not the server itself." Sakaguchi submitted no declaration by Chuan stating that a network switch was the problem, or that it was UH's responsibility. On February 14, 2018, Partika emailed Sakaguchi, with an attachment, explaining why "your network switch does in deed [sic] work" and that the problem "is with your SQL server and data storage array."

Sakaguchi failed to sustain her burden to show a genuine issue of material fact through admissible evidence that Pacific EMPRINTS' servers malfunctioned in 2017 "at the direction of UH Administrators."

21

**(7)** Paragraph 35 of Sakaguchi's amended complaint alleged:

> k.    In the later part of 2017, Dr. Sakaguchi attempted to hire a research assistant from Japan.  The Research Corporation of UH ("RCUH") Administrators informed Dr. Sakaguchi that RCUH policy dictates she must hire someone in Hawaiʻi.  There was no such RCUH policy and this residential hiring restriction has not been imposed on any faculty member other than Dr. Sakaguchi.

Sakaguchi's declaration similarly stated:

> 20.    In the later part of 2017, I attempted to hire a research assistant from Japan.  The Research Corporation of UH ("RCUH") Administrators informed me that RCUH policy dictates she [sic] must hire someone in Hawaiʻi.  There was no such RCUH policy and this residential hiring restriction has not been imposed on any faculty member.

Sakaguchi submitted no evidence that "there was no such RCUH policy" that she hire someone in Hawaiʻi.

And even if Sakaguchi's allegation were true, she did not sue RCUH.  HRS § 304A-3001 (2007) establishes RCUH "as a body corporate[.]"  Its affairs are managed and controlled by a board of directors, which elects a chair.  HRS § 304A-3002 (Supp. 2017).  It has the power to sue and be sued in its own name.  HRS § 304A-3003 (2007).  RCUH's alleged conduct is irrelevant because RCUH is not a defendant, and Sakaguchi offered neither evidence nor argument that RCUH's alleged conduct should be attributed to UH.

**(8)** Paragraph 35 of Sakaguchi's amended complaint alleged:

> l.    In February 2018, Dr. Sakaguchi's faculty colleague informed Dr. Sakaguchi that when said colleague requested to do a training project with Dr. Sakaguchi in the field of disaster management, the UH Vice Chancellor for Research and UH Interim Vice Chancellor for Academic Affairs discouraged the colleague and informed her she must work with Dr. Kim instead.

Provost Bruno was Vice-Chancellor for Research and Interim Vice Chancellor for Academic Affairs in February 2018. His declaration stated:

5.    I have personal familiarity with the operation and judging of the 2017 Strategic Investment Initiative campus-wide competition for research funding to faculty members for the past six (6) years as I had personally started it and there have been three (3) awards over that time period.

6.    During the Fall of 2017, I am informed and believe that Dr. Kristine Qureshi served as one of the committee judges for the 2017 Strategic Investment Initiative campus-wide research funding competition to decide which grant proposal would receive an award.

7.    I did not serve as either a judge or decision-maker on which faculty members' grant proposal would receive an award from the 2017 Strategic Investment Initiative campus-wide competition.

8.    I never asked nor suggested to Dr. Kristine Qureshi that she should work on a research grant proposal with Dr. Karl Kim for the 2017 Strategic Investment Initiative campus-wide competition.

9.    Between 2017-2018, I never attempted to discourage Dr. Kristine Qureshi from working on a research grant proposal with Dr. Ann Sakaguchi on the 2017 Strategic Investment Initiative as that would have been directly contrary to the process of how the campus-wide research competition operated and/or was judged.

Sakaguchi's declaration stated:

21.    In February 2018, my faculty colleague John Casken informed me that when said colleague requested to do a training project with me in the field of disaster management, the UH Vice Chancellor for Research and UH Interim Vice Chancellor for Academic Affairs, Michael Bruno, discouraged the colleague and informed her she must work with Dr. Kim instead.

The Circuit Court correctly sustained UH's objection to hearsay.  Sakaguchi did not offer a declaration or other testimony from John Casken or Kristine Qureshi.  She failed to sustain her burden to show a genuine issue of material fact through admissible evidence.

**(9)**  Sakaguchi's amended complaint alleged:

36.    Dr. Sakaguchi's salary can be greatly enhanced depending on successful grant submissions that result in external funding.  By excluding Dr. Sakaguchi from funding and grant opportunities and jeopardizing Dr. Sakaguchi's grant submissions, Defendants suppress her salary and deny her current and prospective economic and contractual opportunities.

23

UH submitted the declaration of John (Jack) **Barile**, the Interim Director of the Social Science Research Institute in the UH College of Social Sciences. Barile stated:

> 3.    On June 10, 2020, I conducted a search of all grant and contract proposals by faculty members of the College of Social Sciences, UHM as Principal Investigators (PI) or Co-Investigators (who are the lead from the University of Hawaiʻi) (Co-I) from January 1, 2010 to present.
>
>         . . . .
>
> 5.    From January 1, 2010 to present, Ann Sakaguchi only submitted two grant or contract proposals as PI or Co-I. One proposal was for a non-research grant processed on April 11, 2011 and titled "Certified Training of RMI Ministry of Health Medical Staff in Basic Life Support Skills" and in which she was awarded a total of $50,375.00. The other proposal for a research sub-grant processed on January 23, 2013 and titled, "Enhancing Hazard Mitigation and Resiliency in Complex Emergencies and Disasters Using Point of Care, Cyberinfrastructure, and Cultural Outreach" which was *rejected*. This grant was for $430,781.00.

Sakaguchi's declaration stated:

> 28.    John Barile makes a false statement in his June 2020 declaration that I have a record of only two (2) grants since 2011 and of that one was rejected. I have provided counter evidence to the UH Office of the General Counsel of applying for (i) a $25 million U.S. Agency for International Development grant that I applied with Dr. Shirley Daniel in 2012; (ii) a U.S. Department of Health and Human Services HRSA grant for $1.3 million in 2013; (iii) a $386,100 Center for Disease Control and Prevention grant with San Diego State University in 2019; and (iv) approximately $860,000 in National Disaster Life Support trainings [sic]. The competitive grants mentioned above were "eliminated" from my university records at the Office of Research Services, where all faculty pursued grants, received or rejected, are recorded. I did not know this information was eliminated until John Barile had submitted his declaration in 2020.

Sakaguchi's declaration contradicts her allegation that she was excluded from grant opportunities after February 28, 2016. And her memorandum opposing UH's motion did not explain how or why, if her competitive grants were applied for and received, the grants being "eliminated" from UH's records caused her harm. She failed to sustain her burden to show a genuine issue of material fact on this issue.

**V. CONCLUSION**

The Circuit Court's October 9, 2023 Final Judgment against Sakaguchi on all claims asserted against Konan is affirmed; the Final Judgment for UH and against Sakaguchi on Claim 4 for IIED is affirmed; the Final Judgment for UH and against Sakaguchi on Claim 1 is affirmed in part as to all claims under the HWPA except those for pay differential from February 28, 2016 onward for not being selected department chair in alleged violation of the HWPA, and for earnings disparity from February 28, 2016 onward caused by UH's alleged violation of the HWPA, as discussed in sections IV.B.3. and IV.C. above.

This case is remanded to the Circuit Court for further proceedings consistent with this memorandum opinion.

DATED:  Honolulu, Hawaiʻi, April 14, 2026.

On the briefs:

Margery S. Bronster,
Rex Y. Fujichaku,
Skylar G. Lucas,
for Plaintiff-Appellant
Ann Sakaguchi.

Carrie K.S. Okinaga,
Derek T. Mayeshiro,
for Defendants-Appellees
University of Hawaiʻi
and Denise Konan in her
capacity as Dean of the
University of Hawaiʻi at
Mānoa College of Social
Sciences.

Gary Y. Takeuchi,
Justin M. Luney,
for Defendant-Appellee
Denise Konan, individually.

/s/ Karen T. Nakasone
Chief Judge

/s/ Keith K. Hiraoka
Associate Judge

/s/ Clyde J. Wadsworth
Associate Judge